350 So.2d 775 (1977)
FLORIDA TELEPHONE CORPORATION, Petitioner,
v.
William T. MAYO et al., Respondents.
No. 49860.
Supreme Court of Florida.
October 6, 1977.
*776 David B. Erwin and Felix A. Johnston, Jr. of Woods, Johnston & Erwin, Tallahassee, Claude M. Warren of Warren, Snider & Warren, Indianapolis, Ind., J. Thomas Gurney, Jr. of Gurney, Gurney & Handley, Orlando, and W.W. Hill, Jr., Kansas City, Mo., for petitioner.
William L. Weeks, Prentice P. Pruitt, Donald R. Alexander and Harry D. Boswell, Tallahassee, for the Florida Public Service Commission, respondents.
Earl B. Hadlow of Mahoney, Hadlow & Adams, Jacksonville, and Walter H. Alford, Miami, for Southern Bell Telephone and Telegraph Co., intervenor.
BOYD, Judge.
We have before us a petition to review by writ of certiorari[1] Order No. 7285, a final order of the Public Service Commission. The issue presented by the petition concerns the treatment of deferred federal income taxes in the calculation of intrastate toll settlements between Florida Telephone Corporation and Southern Bell Telephone and Telegraph Company for the years 1970 to 1973.
Southern Bell and the nineteen independent telephone companies in Florida, including Florida Telephone, cooperate to provide long distance telephone (toll) service for the State. Cooperation is necessary because calls that originate in one company's territory frequently terminate in another's. As the major participant[2] in the toll service, Southern Bell acts as a clearinghouse for settling between itself and the independents the revenues generated by the service. The revenues[3] are reported to Bell where they are entered into a pool. From the pool Bell makes the settlements by one of two methods. By the first, the Nationwide Averages Settlement Method, Bell returns to the independent an average revenue per call. By the second, the Cost Study Method, the independent, through studies at its expense, makes a determination of its *777 cost (plant, expenses, taxes, etc.), in providing toll service. A method for settling relative to cost is then negotiated between Bell and the independent.
At first the Nationwide Averages toll settlement method was used by Bell and Florida Telephone, but in 1970 the two companies changed to the cost-study method. Their formula for reaching a cost study settlement, the source of this dispute, is contained in a traffic agreement which has retroactive effect to July 1, 1970.[4] Under the agreement Bell reimburses Florida Telephone for its cost, including taxes, and returns to Florida Telephone, as its share of the profits, an amount determined by applying a rate to the company's investment base devoted to toll service. The traffic agreement provides:
"METHOD OF SETTLEMENT  The amount the Independent Company is to receive for its participation in the handling of toll telephone communications will be determined on the basis of a study of the Independent Company's book costs and expenses which are applicable to such traffic. (emphasis ours)
"The components of the interstate [and intrastate] investment base will include appropriate amounts in Accounts 100.1, 100.2, 100.3, and 122, less reserves in Accounts 171, 172 and 176." (emphasis ours) Supplement No. 6 to Traffic Agreement effective July 1, 1970, Exhibit P-11, PSC Docket No. 72196-TP, Record on Appeal, p. 721.
Florida Telephone felt the foregoing provisions were unfair, yet it entered the agreement, presumably because it needed some settlement, inadequate though it might be.
The reason Florida Telephone found the first of the provisions unfair is this: Florida Telephone has taken "accelerated depreciation" deductions for depreciation of its assets in computing its annual federal income tax since 1954.[5] Until 1968 its method of accounting for federal income taxes was "normalization" by which its taxes reported were as if "straight-line depreciation" deductions were taken. In "normalization" accounting the actual taxes paid are shown in one account and the taxes deferred are booked in a separate account. In 1968 Florida Telephone was granted permission by the Public Service Commission to change to the "flow-through" method of accounting for its federal income taxes. In "flow-through" accounting only the actual taxes paid are shown on the accounting books and the deferred taxes flow through to the bottom line on the balance sheet where earnings are listed. Thus, in contrast to the "normalization" procedure, under "flow-through" a smaller amount of taxes are booked as expenses. Although deferred taxes were not booked under its method of accounting, Florida Telephone demanded that Bell reimburse them. Bell refused because under the traffic agreement reimbursements were to be limited to "book costs and expenses."
Florida Telephone found the second provision of the contract unfair because it excludes from its settlements base the deferred taxes accumulated from 1954 to 1967[6] while it excludes from Bell's base only deferred taxes from 1970 forward, since it was not until 1970 that Bell elected to take accelerated depreciation.
Although Florida Telephone did not contest that Southern Bell was not following the contract in the settlements procedure it felt the traffic agreement was inequitable and so it petitioned the Public Service Commission for relief. The hearing examiner, after careful consideration that is shown by the detailed analysis of the problem in his *778 findings of fact and recommendations, recommended a pre-tax method of settlement. Under such a method all income taxes, current and deferred, would be ignored thereby avoiding any inequity caused by their consideration. The examiner could not recommend, however, that the deferred reserves be included in the settlements base because money from those reserves is available for capitalization in "plant," another factor included within the base. The examiner therefore reasoned that to include the reserves in the base would falsely increase costs to the extent they were used for capitalization.
In its final order, Order No. 7285, the Public Service Commission followed the recommendation that the reserves be excluded from the settlements base but could not accept recommendation for a pre-tax approach to cost-study settlement and, instead, ordered that Bell be permitted to continue its practice of reimbursing for "booked" taxes only. Florida Telephone petitions us to review the Order. Bell has been granted leave to intervene in the proceedings before this Court.
Our review of petitions for certiorari from final orders of the Public Service Commission is limited to correcting departures from the essential requirements of law and determining whether the order is supported by substantial and competent evidence. Tamiami Trail Tours, Inc. v. Bevis, 299 So.2d 22 (Fla. 1974). The Commission's denial of Florida Telephone's request that the deferred reserves be included in the settlement's base does not constitute such a departure for the reason given in the examiner's findings and because the Commission, as it stated in its Order, has consistently not allowed regulated industries to gain earnings on deferred taxes because of its policy that the taxes should be held for the rate-payers' benefit.
As to the dispute over the reimbursements of deferred taxes, all the parties agree that those taxes are not included within "book" costs when flow-through accounting is used. Since the disparity between the reimbursement received and what it would have received had it accounted for itida Tes taxes by normalization is undoubtedly substantial, Florida Telephone argues that this Court should remedy the inequity by ordering one of the following forms of relief: that both companies follow the same accounting procedure; that Florida Telephone be allowed to normalize for purposes of the traffic agreement; or that the pre-tax approach recommended by the examiner be adopted. Sitting as the Commission and given the authority to do so, we might have ordered one of the proposed forms of relief. But our scope of review of Public Service Commission orders is narrow and Florida Telephone has not fit this case within it. Cf. Smith Terminal Warehouse Co. v. Bevis, 312 So.2d 721 (Fla. 1975). Although the Commission has the power to regulate telephone service contracts between telephone companies and their patrons, Section 364.19, Florida Statutes, and may require that there be filed with it contracts between telephone companies relating in any way to telephone service or use of telephone lines, Section 364.07, Florida Statutes, the Commission has no statutory authority to regulate the contractual division of long distance toll revenues between telephone companies. And Florida Telephone has not shown that the Commission's refusal to interfere with the revenue division departs in a nonstatutory way from the essential requirements of law. The inequity that Florida Telephone sees in the traffic agreement may be open to judicial remedy if there is a contractual deficiency in the traffic agreement, but it is beyond the Commission's power to cure.
There being no departure from the essential requirements of law in Order No. 7285, the petition for certiorari is hereby denied.
It is so ordered.
ADKINS, Acting C.J., and SUNDBERG, HATCHETT and KARL, JJ., concur.
NOTES
[1] We have jurisdiction. Art. V, § 3(b)(3), Fla. Const. § 350.641, Florida Statutes.
[2] In Florida, Southern Bell is approximately twice as large as the independents combined. Transcript of Record in PSC Docket No. 72196-TP. Record on appeal, p. 44.
[3] Including those between independents and interstate, as well as intrastate.
[4] Later a new formula for division of revenues, not at issue here, was agreed upon by Florida Telephone and Southern Bell.
[5] Accelerated depreciation results in lower taxes in the early years of an asset's life because the depreciation that would take place in the later years is allowed to be deducted early. Ultimately depreciation deductions and tax liability are the same under either accelerated depreciation or straight line depreciation. The advantage of accelerated depreciation is that the timing of tax payments is deferred because of the greater early deduction.
[6] The taxes are held in a reserve which at the end of 1967 totalled 3.3 million dollars.