403 So.2d 962 (1981)
UNITED TELEPHONE COMPANY OF FLORIDA, et al., Petitioners,
v.
Robert T. MANN, et al., Respondents.
No. 58647.
Supreme Court of Florida.
July 30, 1981.
Rehearing Denied October 15, 1981.
*964 Jerry M. Johns, Gen. Counsel, Altamonte Springs, for United Tel. Co. of Florida.
Earl B. Hadlow and John T. Sefton of Mahoney, Hadlow & Adams, Jacksonville, William B. Barfield, Miami, and Robert W. Sterrett, Jr. and Fred A. Walters, Atlanta, Ga., for Southern Bell Tel. and Tel. Co.
Jack Shreve, Public Counsel, Michael McK. Wilson, Deputy Public Counsel, and Benjamin H. Dickens, Associate Public Counsel, Tallahassee, for the Citizens of the State of Florida, cross-petitioners.
Arthur C. Canaday, Gen. Counsel, William S. Bilenky, Deputy Gen. Counsel and Virginia Daire Reber, Associate Gen. Counsel, Tallahassee, for the Florida Public Service Commission, respondents.
BOYD, Justice.
This cause is before us to review a Public Service Commission (commission) order directing United Telephone Company of Florida (United) to refund excess revenues collected during the pendency of a full scale rate making proceeding. We have jurisdiction. Art. V, § 3(b)(3), Fla. Const.
This case began when the public counsel petitioned for a show cause order and immediate rate making proceedings on September 29, 1978. Public counsel asserted that for the year preceding the filing of the petition United had been earning revenues in excess of the ceiling of its last authorized rate of return range of 9.0%-9.2%.[1] He requested the commission order United to show cause why its rates should not be reduced and to schedule interim rate making hearings. Before responding to this petition, the commission in Order No. 8513 initiated a full scale rate making proceeding under section 364.14, Florida Statutes (1977), establishing June 30, 1978 as the end of the test year, and in Order Nos. 8742 and 8773 authorized other utilities to intervene, including Southern Bell Telephone and Telegraph Company (Southern Bell). On March 22, 1979, the commission issued Order No. 8782 granting the public counsel's petition and ordering that an interim rate making proceeding be held on April 11. In this order the commission explained that if it found after the interim hearing that United's rates were excessive, the commission had the authority to either perscribe new rates which would effectuate the decrease or maintain the present rates with the excessive revenues being subject to refund. For purposes of this case we will not distinguish between these two methods of effectuating an interim rate decrease. Cf. Askew v. Bevis, 283 So.2d 337 (Fla. 1973) (amount of rate relief granted by the Public Service Commission was placed under bond on condition that refunds be paid to customers if utility failed to improve its service).
After the interim proceeding, the commission rendered Order No. 8855 on May 1, 1979, finding that approximately 3.3 million dollars of United's annual gross revenues were in excess of the ceiling of its last authorized rate of return and were therefore unjust and unreasonable. The commission ordered United to set aside $275,000 per month beginning May 1, which amount would be subject to refund upon the completion *965 of the comprehensive rate making proceeding.
The comprehensive rate making proceeding was concluded on January 14, 1980, when the commission rendered Order No. 9208, the subject of our review in this case. The commission found that United's rate of return should be 9.62% encompassed by a range of 9.16% to 10.07% and that the adjusted rate base for the test year ending June 30, 1978, was $154,158,358. Despite the increase in United's allowable rate of return, the commission found that United was still earning an excess of $2,803,093 on an annual basis. Therefore the commission ordered United to reduce its rates by that amount and refund the appropriate portion of excess revenues collected since May 1, 1979.
United filed a petition for writ of certiorari, in which Southern Bell joined. The two companies claimed that the commission lacks the statutory authority to hold interim rate decrease proceedings and that if the commission does have that authority it cannot order a refund of amounts of revenues collected that are not in excess of the newly authorized rate of return ceiling. The public counsel filed a cross brief[2] claiming that the commission does have the authority to reduce rates on an interim basis but that the amount to be refunded should be based on the previously, not the newly, authorized rate of return ceiling. In addition public counsel raised a new issue concerning the commission's calculation of a working capital allowance.[3] Naturally, in its answer briefs the commission defended the actions it had taken.
We will first consider the question of whether the commission has the authority to order interim rate decreases. Petitioners United and Southern Bell claim that the section which the commission proceeded under, section 364.14,[4] cannot be interpreted as giving the commission the implied authority to reduce rates on an interim basis. They point out that the statute specifically provides that upon finding that the rates are unjust or unreasonable, the commission must determine just and reasonable rates *966 "to be thereafter observed and in force... ." § 364.14, Fla. Stat. (1977). They argue that calculating new rates after a full rate making proceeding and applying them to the interim period constitutes unlawful retroactive rate making. See City of Miami v. Florida Public Service Commission, 208 So.2d 249 (Fla. 1968).
The commission and public counsel respond by arguing that the procedure used in this case is the reverse of the "make whole" procedure authorized by this Court in Southern Bell Telephone and Telegraph Co. v. Bevis, 279 So.2d 285 (Fla. 1973). In that case we stated that if a company showed that its rate of return was below the minimum previously authorized by the commission, it made a prima facie case for approval of an interim rate increase. We also stated that if the commission was in doubt as to the propriety of the rate of return, it could grant the interim increase contingent upon the outcome of the full hearing and require the company to refund any part of the interim increase which was later found to be improper. We specifically stated that our decision in City of Miami was never meant to preclude the commission from making interim increases contingent on the outcome of a full hearing. By the same token that decision does not preclude the commission from making interim decreases contingent upon the outcome of a full hearing. Since there is no logical reason for distinguishing between rate increase proceedings and rate decrease proceedings, we find that the commission is authorized to order interim rate decreases upon finding that a company is earning revenues in excess of its maximum allowable rate of return.
The question we are faced with now is how much money collected during the interim period should be refunded. United argues that it should have to refund only the amount of revenues collected that are in excess of 10.07%, the ceiling of the newly authorized rate of return range. Public counsel argues that the new rate of return should be applied prospectively and that the refund should be based upon 9.20%, the ceiling of the previous rate of return range. As mentioned earlier the commission took to the middle ground and ordered the refund of any collected revenues that were in excess of the newly authorized rate of return of 9.62%. To resolve this dispute we need to analyze the purpose of and method of calculating a public utility's rate of return.
A regulated public utility is entitled to an opportunity to earn a fair or reasonable rate of return on its invested capital. Gulf Power Co. v. Bevis, 289 So.2d 401 (Fla. 1974). A fair rate of return is for the benefit of the utility's investors. Gulf Power Co. v. Bevis, 296 So.2d 482 (Fla. 1974). This amount "should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain credit and to attract capital." Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944); see also Bluefield Waterworks & Improvement Co. v. Public Service Commission, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923). Therefore the purpose of establishing a fair or reasonable rate of return is to "fairly compensate investors for the risks they have assumed... ." Permian Basin Area Rate Cases, 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968).
The method of calculating a rate of return is primarily based upon calculating the cost of investment capital. There are three main sources of investment capital: debt, preferred stock and common stock. The cost of the first two sources can be mathematically derived whereas the cost of common stock is a matter of economic judgment. Each of these costs expressed in terms of percentage is then multiplied by that particular source's capitalization ratio to achieve a weighted average. The sum of these weighted averages is the rate of return. After this figure is reached, the commission can make further adjustments to account for such things as accretion, attrition, inflation and management efficiency.
As an example we give the calculations used by the commission in deriving the 9.62% rate of return in this case:

*967
 Capitalizaion Cost Weighted
 Amount Ratio Rate Average 
Common Equity $121,052,725 45.71% 13.25% 6.06%
Long Term Debt 112,909,200 42.63 8.34 3.56
Deferred Taxes 30,077,430 11.36 -- --
Investment Tax
 Credit 813,112 .30 -- --
 ____________ _______ ______ _____
 $264,852,467 100.00% 9.62%

The commission found there was insufficient evidence in the record to support any further adjustments. There are no calculations for preferred stock since all of it had been redeemed by June 30, 1978.
The main dispute in this case is the assessment of the cost of United's common stock. United's witness testified that the cost of common equity based upon the test year was 14.25%, whereas the public counsel's witness testified that the cost was between 11% and 12%. The commission felt that United was overstating the cost of common equity and that public counsel was understating it and therefore compromised the two positions by finding that the cost of common equity based on the test year was 13.25%. Although United presented supplemental testimony, the commission did not rely upon the additional evidence, but instead based its decision on data that was gathered and available before the interim hearing was held.
The commission properly refrained from considering the extensive testimony pertaining to the appropriate rate of return at the interim hearing. To have done otherwise would have been tantamount to holding a comprehensive rate making proceeding. The purpose of the interim hearing is to fix temporary rates based upon known and easily measurable changes which have caused the utility's rates to be unjust and unreasonable.[5] Since changes in the cost of common equity are not easily calculable, they are not proper subjects for interim hearings.
That does not mean that the amount to be refunded must necessarily be calculated by the previously authorized rate of return. To hold so would defeat the purpose of allowing the utility to collect excess revenues subject to refund. The commission is unable to determine at the time of the interim hearing the amount of the utility's revenues, if any, which are excessive. Such a determination can only be made after a comprehensive rate making proceeding has been held. A part of that determination is the rate of return which the utility should be authorized to earn during the pendency of the full rate making proceeding. Therefore the commission may base its refund order upon the newly established rate of return so long as the new rate is based upon data that existed before the commission issued its interim order.
Thus the commission is not required to order United to refund all of its revenues collected during the pendency of the full rate making hearing that were in excess of its previously established rate of return ceiling of 9.2%. Nor is the commission required to allow United to keep all the revenues collected that were not in excess of the newly authorized rate of return ceiling of 10.07%. The figure of 10.07% merely establishes the top end of the rate of return range which was calculated to be 9.16% to 10.07%. By establishing a rate of return range in addition to establishing a specific rate of return, the commission is acknowledging *968 the economic reality that a company's rate of return will fluctuate in the course of a normal business cycle. Earnings in excess of the authorized rate of return could possibly be offset by lower earnings in later years. Thus the purpose of having a range is to give the commission some flexibility in deciding whether a public utility's rates should be changed. The existence of the range does not limit the commission's authority to adjust rates even though a public utility's rate of return may fall within the authorized range. For example, if a public utility is consistently earning a rate of return at or near the ceiling of its authorized rate of return range, the commission may find that its rates are unjust and unreasonable even though the presumption lies with the utility that the rates are reasonable and just. The commission's discretion in this matter is not annulled by the establishing of a rate of return range.
We therefore hold that the commission has the discretion to determine the amount of revenues collected during the interim period which are excessive so long as that amount does not exceed the amount ordered subject to refund at the interim hearing. In this case we do not find that the commission abused its discretion. By pegging the amount of refund to the newly authorized rate of return, the commission was taking a neutral stance. If there had been uncontroverted evidence that United's future earnings would be less than its authorized rate of return, then United would have been justified in earning more than its rate of return to offset that amount. Since this is not the case, the commission properly ordered a refund of all revenues collected that were in excess of the newly authorized rate of return.
We now come to public counsel's claim that the commission departed from the essential requirements of law in the method used in calculating United's working capital. At the hearing public counsel proposed a different method of calculating working capital. The commission found fault with both methods so it ordered a generic investigation into the matter. In the meantime it ordered that the traditional method proposed by United be utilized and that the amount of associated revenues be collected subject to refund. Thus this issue has not been adequately presented to us and we therefore refrain from commenting upon the matter.
We affirm the Public Service Commission's order in all its aspects.
It is so ordered.
ADKINS, OVERTON, ALDERMAN and McDONALD, JJ., concur.
ENGLAND, J., dissents with an opinion in which SUNDBERG, C.J., concurs.
ENGLAND, Justice, dissenting.
In the face of a clear statutory directive proscribing retroactive rate making[1] and uniform precedents both in and out of Florida construing precisely that legislative limitation against the commission's action in this case,[2] I must dissent from my colleagues' conclusion that the Public Service Commission had inherent authority to order a refund of any amounts collected by United Telephone Company between May 1, 1979, and January 23, 1980. The legislature recently chose to confer upon the commission the very authority it now claims to possess,[3] but because this statute has only *969 prospective effect, it does not govern this litigation. In the absence of an applicable statute permitting the action taken here, I do not believe that we can substitute good motives or ostensibly equitable principles for legislative authorization.
I recognize that the Court approved inherent authority to make interim rate increases in Southern Bell Telephone and Telegraph Co. v. Bevis, 279 So.2d 285 (Fla. 1973), before specific legislation conferred express authority.[4] I also recognize that, conceptually, the authority for rate decreases and rate increases must flow from the same source, whether inherent or express. Nonetheless, I would not duck the problems of inherent authority simply by conceding that precedent from this Court provides the rationale to continue the "flip side" of an earlier practice.
The evolution of more sophisticated rate making procedures in Florida is manifest in our laws. The legislature has taken giant strides in the regulatory arena in the last seven years. An advocate for the public has been created.[5] File and suspend rate making procedures now exist for the benefit of utility companies.[6] Public Service Commissioners have been removed from elective politics.[7] In short, the regulatory climate in Florida has undergone significant reform.
This Court's Southern Bell decision, I submit, is a relic of a bygone era and should not be resurrected in this enlightened age. See Citizens of Florida v. Mayo, 333 So.2d 1, 6 n. 12 (Fla. 1976).
SUNDBERG, C.J., concurs.
NOTES
[1] This range was established by Public Service Commission Order No. 7109 rendered February 18, 1976.
[2] The Public Service Commission filed a motion to strike public counsel's brief as being untimely filed under Fla.R.App.P. 9.110(f). The commission's motion is premised upon the belief that public counsel is not a respondent to this proceeding. Since this premise is erroneous in light of Fla.R.App.P. 9.020(f), we deny the motion.
[3] United filed a motion to strike portions of the public counsel's cross reply brief which were not limited to this issue. The contents of a cross reply are limited to "argument in response and rebuttal to argument presented in the answer brief." Fla.R.App.P. 9.210(e). This language indicates that the contents of a cross reply brief should be limited to issues initially raised by the cross appellee. We therefore grant the motion.
[4] Readjustment of rates, charges, tolls, etc.; hearing; order compelling facilities to be installed, etc. 
(1) Whenever the commissioners shall find, after a hearing had upon their own motion or upon complaint, that the rates, charges, tolls, or rentals demanded, exacted, charged, or collected by any telegraph company or telephone company for the transmission of messages by telegraph or telephone, or for the rental or use of any telegraph line, telephone line, or any telegraph instrument, wire, appliance, apparatus, or device or any telephone receiver, transmitter, instrument, wire, cable, apparatus, conduit, machine, appliance, or device, or any telephone extension or extension system, or that the rules, regulations, or practices of any telegraph company or telephone company affecting such rates, charges, tolls, rentals, or service are unjust, unreasonable, unjustly discriminatory, or unduly preferential, or in anywise in violation of law, or that such rates, charges, tolls, or rentals are insufficient to yield reasonable compensation for the service rendered, the commissioners shall determine the just and reasonable rates, charges, tolls, or rentals to be thereafter observed and in force, and fix the same by order as hereinafter provided.
(2) Whenever the commissioners shall find after such hearing that the rules, regulations, or practices of any telegraph company or telephone company are unjust or unreasonable, or that the equipment, facilities, or service of any telegraph company or telephone company are inadequate, inefficient, improper, or insufficient, the commissioners shall determine the just, reasonable, proper, adequate, and efficient rules, regulations, practices, equipment, facilities, and service to be thereafter installed, observed and used and fix the same by order or rule as hereinafter provided.
[5] One of the major problems the commission faced at the interim hearing was the introduction of relevant evidence within a minimum amount of time. Much of the evidence was repetitious in that it had been presented at a previous informal proceeding which had apparently been attended by public counsel. Unfortunately the commission operated under the presumption that it could not consider that evidence nor base an interim order on it since it was obtained through an informal proceeding held pursuant to section 120.57(2), Florida Statutes (1978 Supp.). The commission erroneously concluded that it could only issue an interim order after holding a formal proceeding under section 120.57(1). A formal hearing does not need to be held if there is no disputed issue of material fact or if waived by all the parties. If during an informal proceeding a dispute arises as to a material fact and one of the parties insists upon a formal proceeding, there is nothing to prevent the commission from making all of the evidence that had been presented at the informal proceeding part of the record of the formal proceeding.
[1] Section 364.14(1), Florida Statutes (1979), provides that "the commissioners shall determine the just and reasonable rates... to be thereafter observed and in force... ." (emphasis added).
[2] City of Miami v. Florida Pub. Serv. Comm'n, 208 So.2d 249, 259-60 (Fla. 1968); Public Utils. Comm'n v. United Fuel Gas Co., 317 U.S. 456, 63 S.Ct. 369, 87 L.Ed. 396 (1943); Pacific Tel. & Tel. Co. v. Public Utils. Comm'n, 62 Cal.2d 634, 401 P.2d 353, 44 Cal. Rptr. 1 (1965); Michigan Bell Tel. Co. v. Michigan Pub. Serv. Comm'n, 315 Mich. 533, 24 N.W.2d 200 (1946).
[3] Section 366.071(2)(b), Florida Statutes (1980), gives the commission the power to order collection and refund of revenues in a proceeding for interim decrease in rates. It became law in 1980. Ch. 80-35, § 8, Laws of Fla.
[4] Regarding the vitality of Southern Bell after legislative action, see Maule Indus., Inc. v. Mayo, 342 So.2d 63 (Fla. 1976).
[5] § 350.061, Fla. Stat. (1979).
[6] § 366.06(4), Fla. Stat. (1979).
[7] § 350.031, Fla. Stat. (1979).