568 So.2d 1267 (1990)
CITIZENS OF the STATE OF FLORIDA, Appellants,
v.
Michael McK. WILSON, et al., Appellees.
No. 75029.
Supreme Court of Florida.
October 18, 1990.
Jack Shreve, Public Counsel and Charles J. Beck, Asst. Public Counsel, Office of Public Counsel, Tallahassee, for appellants.
Susan F. Clark, Gen. Counsel, Martha C. Brown, Associate Gen. Counsel, and David E. Smith, Director, Div. of Appeals, Florida Public Service Com'n, Tallahassee, and Jerry M. Johns, Vice-President-Gen. Counsel, United Telephone Co. of Florida, Altamonte Springs, for appellees.
PER CURIAM.
We have before us the Public Counsel's request to review Order No. 22060 of the Public Service Commission ("PSC"), 89 *1268 FPSC 10:270 (Oct. 16, 1989).[1] In that order, the PSC rejected the Public Counsel's petition to order a tax savings refund for 1988 to customers of United Telephone Company of Florida ("United"). The Public Counsel asserts that by rejecting the petition, the PSC violated its own tax rule established in Florida Administrative Code Rule 25-14.003 (1982) ("the Tax Rule"). The PSC argues that its order rejecting the Public Counsel's petition is consistent with both the Tax Rule and with a previous decision it made in a related order. We affirm the PSC's order.
The facts of this case are best understood in the context of PSC rate proceedings. Generally, public utility rates are established in a full rate case brought before the PSC. In a full rate case, the PSC sets a utility's rates to allow the company to recover a fair and reasonable rate of return on its invested capital. The rate of return is a range fixed by a percentage figure. The range has a floor, a ceiling, and a midpoint. If revenues exceed the permissible range, the utility is to return the excess revenues to its customers. See generally United Tel. Co. v. Mann, 403 So.2d 962 (Fla. 1981). United's last full rate case was conducted in 1982, at which time the PSC set the midpoint rate of return at 15.75%, taking into consideration the corporate income tax rate that existed at that time.
Anticipating that Congress would enact changes in corporate income tax rates, the PSC in 1982 adopted the Tax Rule to provide a formula for the treatment of the tax savings or deficiencies occasioned by changes in the tax rates affecting all companies within the PSC's jurisdiction.[2] Subsequently, Congress passed the Tax Reform *1269 Act of 1986, decreasing the corporate income tax rate from 46% to 34% effective July 1, 1986. Tax Reform Act of 1986, Pub.L. No. 99-514, 100 Stat. 2085 (1986). When the Tax Reform Act lowered the income tax rate, companies under the PSC's jurisdiction, including United, benefitted from the lower tax rate by getting their tax bills reduced while they continued to collect revenues from ratepayers predicated on the rate of return set under the higher, pre-1986 tax rate. That is considered to be a tax savings under the Tax Rule.
In 1987, the PSC learned that United would accrue a tax savings that year, which could have raised its revenues over the midpoint rate of return in effect at that time. At about the same time, the PSC proposed to impose on United and other companies a permanent reduction of "access charges," the effect of which would have been to cause United to suffer a decline in revenues. Order No. 17053, 87 FPSC 1:79 (Jan. 2, 1987). United timely protested the access charge reduction order, see Order No. 17173 (unpublished), but after negotiations, United and the PSC reached an accord. Consequently, the PSC issued an order reducing United's access charges and increasing United's depreciation expenses by an amount that combined *1270 to account for United's 1987 tax savings. "[T]he access charge reductions and depreciation expense increases will dispose of United's 1987 savings in tax expense resulting from tax reform." Order No. 17429, 87 FPSC 4:240, 4:242 (Apr. 20, 1987). The effect of the order was to balance that year's reduction in revenues with the 1987 tax savings so that United's revenues would not exceed the midpoint rate of return on equity for 1987.
In 1988, the PSC entered Order No. 19726, authorizing a new rate of return on equity for United to be effective in 1988 and 1989. The new rate of return was a range of 12.5% to 14.5%, with a midpoint of 13.5%. The PSC specified that the new rate of return "shall be used for all purposes, which shall include, but not be limited to, the following: ... (3) Rule 25-14.003 regarding income tax expense." Order No. 19726, 88 FPSC 7:284, 7:285 (July 26, 1988).
These prior PSC orders were not appealed.
The proceeding that gave rise to this appeal originated in 1989 when the Public Counsel petitioned the PSC to compel United's compliance with the Tax Rule regarding tax savings that United accrued in 1988. The Tax Rule provides that when "a utility is earning a rate of return which is at or above the midpoint of its authorized range computed without consideration of a tax rate reduction, the utility shall refund all associated revenues." Fla. Admin. Code R. 25-14.003(2)(a). The Public Counsel argued that United's revenues exceeded its midpoint rate of return in 1988, and that United was compelled by the Tax Rule to refund the tax savings.
The PSC denied the petition, asserting the following:
Upon review, we find that Order No. 17429, which addressed several dockets and many issues, had the primary effect of reducing carrier common line access charges in recognition of the tax savings resulting from the [Tax Reform] Act and in lieu of the strict application of the Tax Rule. The effects of both the access charge reduction and the Act continue into 1988 and beyond. When we approved the reduction in United's access charges, we viewed this action as an acceptable disposition of tax savings. At the time of this action, we expected the access charge reduction to have an be [sic] ongoing impact on United's tax savings. Accordingly, our action in reducing United's access charges in 1987 must be considered in determining whether the company's 1988 tax savings have been properly disposed of.

The first step in applying the Tax Rule is to determine the amount of a company's tax savings and then to determine if any of that amount has been disposed of through Commission action. If any tax savings remain after such action has been considered, then the Tax Rule requires that an earnings test be applied to find if any additional refund is necessary. We have reviewed the March 31, 1989 tax savings report submitted by United which indicates that 1988 tax savings were $14,448,254 and concluded that this calculation is accurate. The company also claims that its 1988 revenues were reduced by $14,738,446 as a result of the access charge reduction implemented in 1987. Our review of United's calculation of the effect of the access charge reduction on its 1988 revenues has located no discrepancies. In light of these conclusions, we believe that the entire amount of United's 1988 tax savings was disposed of through the access charge reduction.
If this had not been the case, then we would proceed with the application of the Tax Rule, using 13.5% as United's authorized midpoint for determining any refund. We are aware that the access charge reduction may not be sufficient to offset United's tax savings in future periods; therefore, we intend to apply the Tax Rule through a year-by-year analysis. However, we will take no further action in this docket with regard to the Tax Rule because United's entire 1988 tax savings amount has been disposed of.
As found above, access charge reductions are relevant to the issue of whether *1271 a company's tax savings have been dealt with. Based on our belief that United has no excess 1988 tax savings available for disposition, we deny the Petition. We believe that a reduction in rates which goes into effect in time to prevent overpayment by ratepayers is preferable to a cash refund because the customer never overpays the company.
... . We disagree with [Public Counsel's] interpretation of how the Tax Rule should be applied. In our opinion, it becomes applicable only if rate reductions have not already disposed of tax savings. If United had experienced tax savings in excess of its revenue decreases associated with its access charge reductions, then we would have applied the Tax Rule... . Since no excess tax savings are available, the Motion is dismissed.
Order No. 22060, 89 FPSC 10:270, 10:271-72 (Oct. 16, 1989) (emphasis supplied).
It is undisputed that United experienced a revenue decline of $14,738,446 in 1988 due to the access charge reduction, and that United's tax savings in 1988 amounted to $14,448,254.[3] Likewise, it is undisputed that United's rate of return in 1988 was 14.28%, which was within the permissible range but in excess of the 13.5% midpoint.
The Public Counsel asserts because United's 14.28% rate of return exceeded the 13.5% midpoint, the PSC should have applied the Tax Rule to compel United to refund its tax savings. By ruling as it did, the Public Counsel argues, the PSC violated both the express terms and the intent of its own Tax Rule.
Even though the PSC and United concede that United's rate of return was 14.28%, they argue that there were no tax savings to refund because United's tax savings were disposed of by the access charge reduction. To apply the Tax Rule would impose an unfair form of "double-dipping," they argue, because it would be unfair to refund the tax savings after it had already been accounted for in the access charge reduction.
This Court's role in reviewing orders of the PSC is "to determine whether the PSC's action comports with the essential requirements of law and is supported by substantial competent evidence." Pan Am. World Airways, Inc. v. Florida Pub. Service Comm'n, 427 So.2d 716, 717 (Fla. 1983). See also Manatee County v. Marks, 504 So.2d 763 (Fla. 1987); Florida Power Corp. v. Public Serv. Comm'n, 487 So.2d 1061 (Fla. 1986); Citizens v. Public Serv. Comm'n, 464 So.2d 1194 (Fla. 1985); Florida Tel. Corp. v. Mayo, 350 So.2d 775 (Fla. 1977). An agency's interpretation of its own rules is entitled to great deference. E.g., Woodley v. Department of Health & Rehabilitative Servs., 505 So.2d 676, 678 (Fla. 1st DCA 1987); Franklin Ambulance Serv. v. Department of Health & Rehabilitative Servs., 450 So.2d 580, 581 (Fla. 1st DCA 1984). The burden is on the party seeking review to "overcome the presumption of correctness attached to orders of the PSC." Pan Am. World Airways, 427 So.2d at 717; Manatee County, 504 So.2d at 765. That burden is satisfied if it is shown that "the agency's construction clearly contradicts the unambiguous language of the rule," Woodley, 505 So.2d at 678, or if it "is arbitrary or unsupported by evidence." Manatee County, 504 So.2d at 765. In such a case, "the construction is clearly erroneous and cannot stand." Woodley, 505 So.2d at 678.
We find, consistent with these principles, that the PSC did not act contrary to essential requirements of law. The PSC could have reasonably and appropriately determined that its earlier action in 1987, reducing the access charge rate, eliminated the 1988 tax savings, and therefore the Tax Rule would not apply in these circumstances. We note that the Public Counsel did not appeal the PSC's 1987 order in which it likewise balanced the 1987 tax savings. The PSC's order is, accordingly, affirmed.
It is so ordered.
SHAW, C.J., and OVERTON, McDONALD, EHRLICH, GRIMES and KOGAN, JJ., concur.
BARKETT, J., dissents with an opinion.
*1272 BARKETT, Justice, dissenting.
I believe the PSC acted inappropriately in this case by failing to follow its own applicable rule.
To assess the PSC's action in light of the principles of law set forth in the majority opinion, one must first look to the policy underlying the PSC's ratemaking authority and to the Tax Rule itself. The PSC's policy is to set a utility's rate at a level that allows the utility to recover a fair and reasonable return on its invested capital. United Tel. Co. v. Mann, 403 So.2d 962 (Fla. 1981). The PSC periodically adjusts a utility's rate of return taking into account many factors. The bottom line is that the utility's revenues should be sufficient to fall within the established range set for its rate of return. In keeping with that policy, the PSC devised the Tax Rule to deal with one particular problem: to assure that a utility's revenues remain at a reasonable level without requiring the PSC to establish a new rate of return each time the corporate tax rate changes. The Tax Rule protects PSC customers from paying more than the utility reasonably is entitled to receive, and it protects the utility from losing money when it collects less revenue than it reasonably needs to pay its tax bill. It is clear that the Tax Rule was not intended to insulate a utility from other changes in revenues such as the one caused by the access charge reduction.
The plain language of the Tax Rule unambiguously expresses the underlying policy. The "tax savings" provision says that "[w]hen... a utility is earning a rate of return which is at or above the midpoint of its authorized range computed without consideration of a tax rate reduction, the utility shall refund all associated revenues." Fla. Admin. Code R. 25-14.003(2)(a) (1982) (emphasis supplied). The Tax Rule says nothing about offsetting tax savings refunds with access charge reductions or any other rate adjustments. Moreover, those adjustments may be and are made periodically regardless of changes in the tax rate. The rule simply requires the PSC to determine whether the utility's revenues exceeded its midpoint rate of return. If so, the utility is required to refund all associated revenues through procedures established in rule 25-14.003. Thus, I conclude that the PSC violated the plain language of the Tax Rule by applying it as it did in these circumstances.
The PSC argues that it essentially complied with the Tax Rule because United's 1987 tax savings were the PSC's "primary impetus" for imposing an access charge reduction. The PSC's argument is premised on a finding that it established the access charge reduction solely or predominantly to account for the tax savings. If this were so, I would agree with the majority, for I cannot say that the PSC's application of the Tax Rule necessarily would be an impermissible method of accounting for the tax savings. However, the record refutes the PSC's contention. The PSC made quite clear in January 1987 that it proposed to permanently reduce telephone company access charges to correct "the increasing disparity between inter- and intrastate rates and the commensurate growth in bypass pressures," and not because of tax savings. Order No. 17053, 87 FPSC 1:79, 1:81 (Jan. 2, 1987).
In 1987, when the PSC ordered the reduction of United's access charges, it said:
[W]e find that the public interest would be served through our ordering United to reduce access charges and increase depreciation expense by the amount of its anticipated 1987 tax savings.

Our action here is intended to deal with a number of outstanding issues. In recognition of the tax law change, we will order the disposition of $7,150,000 associated with United's tax expense reduction for 1987. This will be in lieu of the application of Commission Rule 25-14.003 [(the Tax Rule)].

Order No. 17429, 87 FPSC 4:240, 4:241 (Apr. 20, 1987) (emphasis supplied). The PSC merely noted as an aside that the rate reduction would not have a big and immediate detrimental impact on telephone companies because other revenue sources would "partially or totally offset any lost access charge revenues. As only one example, we note that the Tax Reform Act of 1986 will *1273 result in a tax expense savings for each [local exchange company]." Id.
The PSC also argues, and the majority implies, that Order No. 17429, in which it balanced United's 1987 access charge revenue reduction with its 1987 tax savings, created ample precedent to justify the subsequent order at issue here, Order No. 22060. I cannot agree. First, by its own terms, Order No. 17429 was merely an adjudication limited to the situation as it existed in 1987, and all evidence points to the conclusion that the PSC did not intend that order to be a generally applicable statement of permanent PSC policy. Second, Order No. 17429 was the product of a negotiated agreement. There was nothing in that order to put the public on notice that the order's effect would spill over into 1988 and beyond to eliminate other tax savings refunds. Third, the record makes clear that access charge reductions and the Tax Rule were never intended to be related. Rather, the PSC merely linked them in Order No. 17429 by mutual agreement as a onetime measure. Moreover, it makes no sense for the PSC to claim that it initiated a permanent policy offsetting rate reductions with tax savings when it refused to do so in Order No. 17053, where the PSC said, "we are expressly declining to make any provision in this order for any generic mechanisms to offset any access revenue losses." Order No. 17053, 87 FPSC at 1:81 (emphasis supplied).
As to the PSC's argument about unfair "double-dipping," I fail to see how United is being treated unfairly so long as its rate of return remains within the range that was established to provide United a reasonable return on its investment. To the contrary, affirming the PSC's order results in a windfall for United due to the purely fortuitous change in the corporate income tax rate. Cf. Florida Power Corp. v. Public Serv. Comm'n, 487 So.2d 1061, 1063 (Fla. 1986) (PSC order reversed because, in part, "if we were to uphold the order of the Commission, the ratepayers would receive a substantial windfall.").
If the PSC's approach in Order No. 22060 serves the public interest well, then the PSC should have sought to formally amend rule 25-14.003(2)(a) accordingly with the appropriate notice to the public. In my opinion, the rule as written does not allow the PSC to fundamentally alter its application in this manner.
NOTES
[1] The Public Counsel is responsible for providing legal representation for the people of the state in Florida Public Service Commission proceedings. § 350.0611, Fla. Stat. (1987). Jurisdiction is conferred upon this Court by article V, section 3(b)(2) of the Florida Constitution, and sections 350.128(1) and 364.381 of the Florida Statutes (1987).
[2] The Tax Rule provides:

25-14.003 Corporate Income Tax Expense Adjustments.
(1) Definitions. For the purposes of this rule, the following definitions shall apply:
(a) "Tax Savings." The difference between the tax expenses for a utility calculated under the previously effective corporate income tax rates and those calculated under newly effective, reduced corporate income tax rates.
(b) "Tax Deficiency." The difference between the tax expenses for a utility calculated under newly effective, higher corporate income tax rates and those calculated under the previously effective corporate income tax rates.
(c) "Associated Revenues." Those revenues resulting from the application of a utility's revenue expansion factor to a tax savings or tax deficiency.
(d) "Previously Effective." Refers to the corporate income tax rate used in a utility's last rate case or show cause proceeding, or used in the last tax expense adjustment by the Commission, whichever occurred most recently.
(e) "Tax Rate." The statutory tax rates, both federal and state, applicable to utility income, including any surcharges, minimum taxes, and other adjustments to the basic percentage tax rates.
(f) "Midpoint." The midpoint of the range of return approved by the Commission in the utility's last rate case, adjusted for the cost of any debt issued subsequent to that rate case and prior to the commencement of a tax savings refund or tax deficiency collection.
(2) Tax Savings Refunds. In accordance with subsection (5) of this rule and using a calendar year as the basis of the calculation:
(a) When, during the reporting period described in paragraph (5)(a) below, a utility is earning a rate of return which is at or above the midpoint of its authorized range computed without consideration of a tax rate reduction, the utility shall refund all associated revenues as described in paragraph 5(c).
(b) When, during the reporting period described in paragraph 5(a) below, a utility is earning a rate of return which is below the midpoint of its authorized range computed without consideration of a tax rate reduction, the utility shall refund only those associated revenues which cause the utility to earn in excess of that midpoint, as described in paragraph 5(c).
(3) Tax Deficiency Collections. In accordance with subsection (5) of this rule and using a calendar year as the basis of the calculation:
(a) When, during the reporting period described in 5(a) below, a utility is earning a rate of return which is at or below the midpoint of its authorized range computed without consideration of a tax rate increase, the utility shall collect all associated revenues, as described in paragraph 5(c).
(b) When, during the reporting period described in 5(a) below, a utility is earning a rate of return which is above the midpoint of its authorized range computed without consideration of a tax rate increase, the utility shall collect only those revenues which cause the utility to earn below that midpoint, as described in paragraph 5(c).
(4) Reporting requirements. On or before March 1st of every year following a tax rate change, each utility shall furnish a final report, in the form prescribed by the Commission. The report shall cover only the prior calendar year during which the tax rate change was effective.
(5) Procedures.
(a) Refunds or collections shall be calculated from the effective date of any tax rate change through the end of the calendar year. If the tax rate change is in effect for only part of a tax year, the refund or collection shall be calculated in accordance with the utility's customary accounting treatment as authorized by the federal or state taxing authority for tax rate changes which occur during a tax year.
(b) A further change in the tax rate shall end one period of compliance and initiate a new period but shall not affect any refund or collection already in progress pursuant to this rule.
(c) Together with the final report described in subsection (4) of this rule, each utility shall file a petition containing a calculation of and the method for refunding or collecting any tax savings or deficiency for the tax year of the report. The Commission will review the petition and either approve it, approve it with modification, or deny it; an opportunity for a hearing on the Commission's decision will then be provided, if requested. Thereafter, the utility shall either make the refund to or collect the deficiency from its existing customers in accordance with paragraphs (e) and (f) of this subsection.
(d) Upon its own or other motion, the Commission may determine that a refund or collection for a particular year is impractical because its amount will not warrant the expense of making the refund or collecting the deficiency. In such an event, no refund or collection will be made for that year.
(e) The utility may make any refund or collection either as a lump sum payment or billing or in monthly installments not to exceed twelve (12) months. Such refunds or collections shall be made to or from current customers of the utility at the time that such refunds or collections are to be effected. In either event, the utility shall refund or collect the amount with interest accruing on any outstanding balance from the date of overcollection or underpayment. Interest shall be set by the Commission.
(f) An electric utility shall determine each customer's share of refund or collection on a kilowatt hour basis. A telephone company shall determine each customer's share of refund or collection based on existing general residence and business local rate relationships. Other utilities shall determine each customer's share of refund or collection based on consumption or any other reasonable basis specified in the utility's petition and approved by the Commission.
(6) Effect of Rate Case or Show Cause Proceeding. A tax savings refund or tax deficiency collection shall be consistent with this rule except that:
(a) The issue of a tax savings refund or tax deficiency collection shall be decided in the course of rate cases and show cause proceedings that are pending when a tax rate change becomes law, or that commence prior to the close of the tax year in which a tax rate change becomes effective.
(b) Nothing in this subsection shall be construed as limiting the operation of the tax expense adjustment process under this rule either in completing a tax savings refund or tax deficiency collection for any tax years prior to the year in which a rate case or show cause proceeding is initiated. It shall also not prohibit a tax savings refund or tax deficiency collection for any tax year or portion thereof ending prior to the final order in a rate case or show cause proceeding.
Fla. Admin. Code R. 25-14.003 (1982).
[3] Apparently the close proximity of the two figures was merely coincidental.