## COMMONWEALTH GAS PIPELINE CORPORATION

### V.

## ANHEUSER-BUSCH COMPANIES, INC., ET AL.

Record No. 860705

April 24, 1987

Present: Carrico, C.J., Cochran,* Poff, Compton, Stephenson, Russell, and Thomas, JJ.

---

\* Justice Cochran participated in the hearing and decision of this case prior to the effective date of his retirement on April 20, 1987.

Stephen H. Watts, II (McGuire, Woods & Battle, on briefs), for appellant.

James C. Dimitri, Assistant Attorney General (Mary Sue Terry, Attorney General; Gail Starling Marshall, Deputy Attorney General; Anthony Gambardella, Senior Assistant Attorney General, on brief), for appellee, Division of Consumer Counsel, Office of Attorney General.

Sherry H. Bridewell (Lewis S. Minter; Stewart E. Farrar; Robert M. Gillespie; Edward L. Flippen; Bruce V. Thomas; Mays &

*Valentine,* on brief), for appellees, State Corporation Commission, Anheuser-Busch Companies, Inc., Owens-Illinois, Inc., and Reynolds Metals Company.

No brief or argument for appellee, Virginia Natural Gas, Inc.

THOMAS, J., delivered the opinion of the Court.

In this appeal of right, Commonwealth Gas Pipeline Corporation (Pipeline) contends that the State Corporation Commission (Commission) was without power to order a certain refund and that the Commission used an improper accounting method in calculating the rates that could be charged by Pipeline. We find no error in the Commission's disposition of this case; therefore, we will affirm the Commission's order.

## I.

The facts concerning the refund issue are as follows: On September 10, 1985, Pipeline initiated a general rate case by filing an application to revise its tariffs. In that application, Pipeline stated that the proposed tariffs were designed to develop a decrease in annual operating revenues in the amount of $755,000. The application pointed out that in the twelve-month test period ending March 31, 1985, Pipeline had achieved an overall rate of return of 14.63% and a return on common equity of 21.02%. The application stated as follows concerning the receipt of excess revenues: "A comparison of [the] annual revenue requirement with the adjusted test period revenues produced from Company operations makes it apparent that *Pipeline is experiencing a jurisdictional revenue excess* in the amount of $755,000 . . . ." (Emphasis added.) Pipeline's application also requested a suspension of the proposed tariffs pursuant to the provisions of Code § 56-238.

On September 20, 1985, the Division of Consumer Counsel of the Office of the Attorney General (Consumer Counsel), responded to Pipeline's application by moving that suspension of the proposed tariffs be denied. Consumer Counsel requested that the proposed tariffs be implemented "subject to refund with interest pending hearing and final disposition." Consumer Counsel described the figures contained in Pipeline's application as an "admitted overrecovery."

On September 30, 1985, Pipeline responded to Consumer Counsel's motion. Pipeline urged the Commission to suspend the proposed tariffs. It advanced two main reasons in support of suspension. First, Pipeline explained that the proposed tariffs contained "significant revisions in the terms and types of service being offered and in the design used to calculate the proposed rates." Pipeline pointed out that these significant changes "will necessarily result in shifts among Pipeline's customers of Pipeline's overall cost of service, regardless of the levels of annual revenues ultimately authorized by the Commission." Second, Pipeline explained that if the proposed rates had gone into effect without suspension, it and its suppliers might have had to make certain long term commitments "that would be difficult to undo."

In its September 30, 1985 response, Pipeline made two other points. It questioned whether the Commission had any legal authority to suspend a rate reduction subject to refund. According to Pipeline, the suspension statute referred to revenue increases, not revenue reductions. Further, Pipeline submitted that because its application did not contain an effective date for its proposed tariffs, Code § 56-240 could not operate to cause the proposed rates to go into effect automatically subject to refund in the event the Commission refused to order a suspension.

On October 7, 1985, Allied Corporation (Allied), one of Pipeline's direct customers, filed its opposition to Consumer Counsel's motion to implement the proposed tariffs subject to refund. Allied argued for partial suspension. It contended that the most significant changes were in the transportation rates and that, as a result of those changes, Allied's basic transportation rate would double. For these reasons, Allied requested that the transportation rates be suspended while the other rates be permitted to go into effect. Allied concluded by saying that if the Commission decided against partial suspension, it should suspend all the proposed tariffs.

On October 15, 1985, Anheuser-Busch Companies, Inc. (Busch) moved to suspend the transportation rates. It did not comment on the other rates. Busch explained that the proposed transportation rates included "a 100% increase over Pipeline's existing interruptible transportation rate."

On October 17, 1985, Pipeline responded to Allied's motion for partial suspension. It opposed partial suspension on the ground that if partial suspension were granted Allied would receive a sub-

stantial advantage over Pipeline's other customers and would do so at Pipeline's expense.

On October 21, 1985, Virginia Natural Gas (VNG), another Pipeline customer, filed a response on the question of suspension. VNG argued that the proposed tariffs were so complex that full suspension was warranted.

On October 22, 1985, the Commission issued an Order of Notice and Hearing. The Commission explained that because of the facts and circumstances of this particular case, neither immediate implementation of the proposed tariffs nor suspension of those tariffs was warranted. The Commission wrote as follows:

> Without a thorough investigation and hearing, the Commission cannot find that the proposed changes to the rates, terms and conditions are reasonable, therefore it is not appropriate to implement the changes proposed by the Company in its application on an interim basis. However, to preclude the Company from overearning during the interim period, which was the concern of the Consumer Counsel's motion, all presently effective rate schedules should be continued on an interim basis for service rendered on and after the date of this order subject to refund pending final determination.

The Commission ordered that the "presently effective tariff rates, terms, and conditions shall be continued as interim rates for service rendered on and after the date hereof, and that such interim rates shall remain subject to refund pending final determination of this case."

Pipeline moved for reconsideration of the October 22, 1985 Order (the "October Order"). Pipeline contended that the Commission had no authority to convert its existing rates into interim rates. According to Pipeline, because the rates in existence up to October 22, 1985, had been approved by the Commission they were presumed to be just and reasonable. Pipeline argued that to order it to refund revenues collected under existing rates amounted to unlawful retroactive ratemaking.

By order dated November 12, 1985, the Commission denied Pipeline's motion for reconsideration. The Commission pointed out that pursuant to Code § 56-238, it could have suspended the proposed tariff increases while implementing the proposed decreases. It explained that instead of taking that approach, it ordered a pro-

cedure that benefitted both Pipeline and its customers. The Commission explained that Pipeline benefitted because by keeping interim rates at current levels, Pipeline faced "no risk of underrecovery during the interim period." The customers were said to have been fully protected by the refund provision.

The Commission noted that it used a similar procedure in *Comm.* v. *Potomac Edison*, 219 Va. 1023, 245 S.E.2d 73 (1979), a decision which was affirmed by this Court without any discussion of the issue now under review. The Commission stated that in essence it had simply ordered interim rates at a level different from those proposed by Pipeline.

The case came on for a hearing before an examiner on March 25, 1986. The hearing examiner issued his report on May 6, 1986. The examiner declined "to recommend that the Commission revisit" the refund issue. He recommended, among other things, that "the company be directed to make an appropriate refund. . . ."

The Commission issued its Final Order on July 11, 1986. There, the Commission found it "appropriate to order refunds for services rendered during the interim period." The Commission ordered a refund of "all revenue collected from the application of the interim rates which became effective for service rendered on and after October 22, 1985 to the extent that such revenue exceed[ed] the revenue which would have been collected by application, in lieu thereof, of the permanent rates to be filed."

Pipeline makes three arguments with regard to the refund issue. First, according to Pipeline, the order that it refund revenues from October 22, 1985, through the final determination of the issues in its general rate case is retroactive ratemaking because the rates in effect from October 22, 1985, were legal rates approved by the Commission and presumed to be just and reasonable until changed by the Commission. Pipeline's second argument is the key to the first. In this argument, Pipeline contends that the Commission had no power to convert Pipeline's existing rates to interim rates subject to refund as it purported to do in the October Order. In its third argument, Pipeline contends that it was denied due process because the Commission issued the October Order without giving it notice and an opportunity to be heard concerning the conversion to interim rates ordered by the Commission.

The first two issues are interrelated. In our view, only if the Commission had no power to convert the then existing rates to

interim rates as it purported to do in the October Order is there any issue in this case of retroactive ratemaking. That concept concerns the attempt to go back in time to order refunds of revenues collected under rates that were legally in effect at the time the revenues were collected. *See Commonwealth* v. *Old Dom. Power Co.*, 184 Va. 6, 34 S.E.2d 364 (1945); *Alkali Works* v. *N. & W. R. Co.*, 147 Va. 426, 137 S.E. 608 (1927). Here, the Commission submits that Pipeline's legally existing rates were changed on October 22, 1985, so that they no longer existed. Thus, the Commission argues, the refund does not affect existing rates but only interim rates. This is true if the October Order was proper.

The Commission, Consumer Counsel, and the other appellees contend that the interplay of several statutory provisions makes clear that the October Order was a proper exercise of Commission authority. We agree.

The analysis begins with Code § 56-35, which gives the Commission general powers of regulating public service companies. It provides as follows:

> The Commission shall have the power, and be charged with the duty, of supervising, regulating and controlling all public service companies doing business in this State, in all matters relating to the performance of their public duties and their charges therefor, and of correcting abuses therein by such companies.

This statute is relied on by the Commission as giving it "the power" and "the duty" to regulate Pipeline in all matters relating to the "charges" for the performance of Pipeline's "public duties." Pipeline argues that this provision has no application to the present problem because it is not contained in the provisions concerning public utilities. We disagree. Code § 56-35 is clearly labeled as a general provision affecting all public service companies, which obviously includes public utilities such as Pipeline.

The next step in the statutory analysis is Code § 56-234, which reads in pertinent part as follows: "It shall be the duty of every public utility to furnish reasonably adequate service and facilities at reasonable and just rates to any person, firm or corporation along its lines desiring same." Code § 56-234 must be read, in this case, in conjunction with Code § 56-235.2 because Code

§ 56-235.2 essentially defines just and reasonable rates; it provides in pertinent part as follows:

Any rate, toll, charge or schedule of any public utility operating in this Commonwealth shall be considered to be just and reasonable only if: (1) the public utility has demonstrated that such rates, tolls, charges or schedules in the aggregate provide revenues not in excess of the aggregate actual costs incurred by the public utility in serving customers within the jurisdiction of the Commission, subject to such normalization for nonrecurring costs and adjustments for known future increases in costs as the Commission may deem reasonable, and a fair return on the public utility's rate base used to serve those jurisdictional customers. . . .

When Pipeline filed its application in which it set forth data which demonstrated that it was generating revenues in excess of the aggregate actual costs incurred in serving its customers and in which it, quite properly, requested a reduction in revenues, it effectively admitted that it was in breach of its duty under Code § 56-234.

■ Once the Commission learned of the excess rates, it was duty bound under Code § 56-35 to act. The question became what action was appropriate for the Commission to take. Code § 56-235 supplies the answer; it provides as follows:

*If upon investigation* the rates, tolls, charges, schedules, or joint rates of any public utility operating in this State shall be found to be *unjust, unreasonable, insufficient or unjustly discriminatory or* to be *preferential or otherwise* in violation of any of the provisions of law, the State Corporation *Commission shall have power to fix and order substituted therefor such rate or rates, tolls, charges or schedules as shall be just and reasonable.* All rates, tolls, charges or schedules set by the Commission shall be valid only if they are in full conformance with the provisions of this chapter.

(Emphasis added.) This provision clearly gives the Commission the power "to fix and order substituted" just and reasonable rates for rates that are unjust and unreasonable.

Pipeline contends, however, that Code § 56-235 did not come into play in this case and cannot be relied on by the Commission

because the Commission "has admitted that its action was taken not after investigation, but based on the face of the application. Moreover, the Commission did not 'substitute' new permanent rates it found to be just and reasonable."

In our opinion, when the Commission considered Pipeline's application and discovered therein a request for a reduction in revenues based on Pipeline's having received, in the test year, revenues in excess of its cost of providing service and a fair return on rate base, the Commission had before it an admission of unjust and unreasonable rates. The Commission was entitled to rely upon the representations made by Pipeline in its application. No further investigation was necessary to permit the Commission to invoke Code § 56-235. We hold that the Commission's consideration of Pipeline's application was a sufficient investigation for the purposes of Code § 56-235.

Nor was the Commission required by Code § 56-235 immediately to substitute *permanent* just and reasonable rates. Pipeline reads a condition into the statute which is not contained therein. We hold that the October Order was a proper exercise of authority by the Commission. Consequently, as noted above, the refund of the interim rates that went into effect October 22, 1985, is not retroactive ratemaking.

We turn now to Pipeline's due process argument. Pipeline contends that it should have had notice and an opportunity to be heard before the Commission converted its existing rates to interim rates subject to refund. In our opinion, Pipeline's due process rights were not violated.

When Pipeline filed its application, it requested suspension. Thereafter, Consumer Counsel requested immediate imposition of the proposed tariffs. Pipeline responded, again arguing for suspension. Other interested parties filed papers, some suggesting partial suspension, others suggesting full suspension. In various additional responses, all prior to the October Order, Pipeline asserted that the only choice open to the Commission was to suspend or to implement.

This assertion was legally incorrect. Because of its erroneous view of the law, Pipeline failed to address any alternatives except implementation or suspension. The Commission did not limit the arguments made by Pipeline. Pipeline had full opportunity to advance any argument it deemed appropriate concerning the treatment of its rates. Pipeline is charged with knowledge that the

Commission was duty bound to take action to eliminate unjust and unreasonable rates. *See* Code § 56-235. Pipeline knew, as a matter of fact, that its rates were unjust and unreasonable. Thus, at the time Pipeline filed its application, it should have known that its filings raised the issue of how to prevent the continued collection of excess revenues. Pipeline failed to address this issue though it had ample opportunity to do so.

■ Pipeline relies on *VEPCO* v. *State Corp. Comm.*, 226 Va. 541, 312 S.E.2d 25 (1984), in support of its due process argument. However, *VEPCO* is distinguishable. There, based on the face of the utility's application, the Commission made a *final determination* that the utility was not entitled to an increase in its rate of return on common equity. The October Order in this case did not make a final determination of anything other than that the existing rates were unjust and unreasonable, a fact admitted by Pipeline. The October Order simply protected the rights of all concerned, utility and customers alike. The October Order did not end any part of the case; it laid down the rules under which the case was to proceed. What happened here is altogether different from what happened in *VEPCO*. We hold that Pipeline was not denied due process.

## II.

In its final order, the Commission adopted an accounting procedure recommended by the hearing examiner which placed interest generated by customer funds "above-the-line," crediting those funds to the revenue requirements of Pipeline. This procedure reduced the Company's revenue requirement to the benefit of the customers who provided the funds on which the interest was generated.

Pipeline complains that there was no basis in the record for the Commission's adopting the "above-the-line" accounting procedure. Pipeline is wrong in this assertion. S. Frank Leis, Deputy Director for the Commission's Division of Accounting and Finance, testified on behalf of the Commission's staff concerning the proper method to account for returns from temporary cash investments (TCI's). Leis recommended that the funds in question should be accounted for by developing and applying "a ratio of capitalization to rate base." Despite his recommendation he made

clear that two other methodologies were acceptable. He testified as follows:

> Q. What are the various other methodologies that could be used to recognize the Company's excess funds invested in TCI's?
> A. Recognition of these funds could be accomplished by:
>    1. *Moving interest income above the line*;
>    2. Adjusting the Rate Base Working Capital Allowance; or
>    3. Ratioing Rate of Return.
>
> While *all three methods produce approximately the same result*, the Staff has selected the Rate of Return ratio in order to be consistent with Staff recommendations in previous rate cases.

(Emphasis added.)

In its Final Order, the Commission explained its use of the above-the-line accounting method. Pipeline complains of the *method* adopted by the Commission, not of the *result* reached. Leis' testimony makes clear that the "ratioing" method he recommended and the above-the-line method employed by the Commission would produce approximately the same result. Pipeline's argument on this issue must be rejected because "[i]n a rate case, it is the result reached, not the method employed that is controlling." *Gen. Tel. Co. Southeast v. Corp. Comm.*, 220 Va. 481, 484, 259 S.E.2d 824, 826 (1979). *Accord Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 602 (1944).

### III.

We find no merit in Pipeline's assignments of error; therefore, we will affirm the Commission's Order.

*Affirmed.*