980 P.2d 37 (1999)
127 N.M. 254
1999-NMSC-016
In the Matter of a COMMISSION INVESTIGATION INTO THE 1997 EARNINGS OF U S WEST COMMUNICATIONS, INC. in New Mexico.
U S West Communications, Inc., Petitioner,
v.
New Mexico State Corporation Commission, Respondent, and
Patricia A. Madrid, New Mexico Attorney General, Intervenor-Respondent.
No. 25,378.
Supreme Court of New Mexico.
March 11, 1999.
*40 Montgomery & Andrews, P.A., Thomas W. Olson, Sarah M. Singleton, Andrew S. Montgomery, Santa Fe, U S West Communications, Inc., Lynn Anton Stang, Denver, CO, for Petitioner.
Hon. Patricia A. Madrid, Attorney General, Richard Weiner, Assistant Attorney General, Karen L. Fisher, Assistant Attorney General, Charles F. Noble, Assistant Attorney General, Santa Fe, for Respondent.
Hon. Patricia Madrid, Attorney General, Stuart M. Bluestone, Assistant Attorney General, Dana David, Assistant Attorney General, Santa Fe, for Intervenor-Respondent.

OPINION
MINZNER, Chief Justice.
{1} U S West Communications, Inc. challenges the May 29, 1998, order of the New Mexico State Corporation Commission that requires an interim rate reduction in the amount of $22,350,000 annually to be spread equally across the dial tone rate for U S West's residential and business customers. U S West asserts that the Commission's order must be annulled and vacated because it resulted from proceedings that violate U S West's constitutional right to due process. In particular, U S West contends that the Commission did not give U S West adequate notice and opportunity to be heard before imposing a rate reduction, as evidenced by (1) the absence of any reference to a rate reduction in the Commission's notice of hearing, (2) the failure of the Commission's staff to identify its witness prior to the hearing, and (3) the lack of any precedent for imposing a rate reduction without all the trappings of a general rate case. U S West also contends that the Commission's order was tainted by bias and prejudgment, as evidenced by (1) the comments attributed to a commissioner in a newspaper article, and (2) the decision of the Commission's counsel to accept an offer of employment with one of U S West's competitors while the rate investigation was pending.
{2} The Commission's May 29 order was removed to this Court for review pursuant to Article XI, Section 7 of the New Mexico Constitution (as amended 1982).[1] Noting our jurisdiction under Article XI, Section 7, see Attorney Gen. v. New Mexico State Corp. Comm'n (In re Rates and Charges of U S West Communications, Inc.), 121 N.M. 156, 160, 909 P.2d 716, 720 (1995) [hereinafter U S West 1995], we determine that the Commission had the authority to order an interim rate reduction without first bringing a general rate case to completion. While such authority to grant interim rate relief cannot be lawfully exercised without the procedural safeguards required by the Due Process Clause, U.S. Const. amend. XIV, § 1, in this case we determine that U S West was given the process that it is due. Therefore, we affirm the Commission's order granting interim rate relief.

I. BACKGROUND
{3} On April 1, 1998, U S West filed its New Mexico Annual Report for the year ending December 31, 1997. On the same date that the annual report was filed, the Commission issued a notice of hearing and order stating its intent to "conduct an investigation to determine whether [U S West] is earning a return in excess of the authorized return on rate base of 10.85% and the authorized return on equity of 12.4% set by the Commission in Docket No. 92-227-TC." The notice of hearing and order stated that "[a] hearing will be held on April 16, 1998 ... [to] hear [U S West's] case in support of the propriety of its earnings for the year ending *41 December 31, 1997, and for such other evidence and testimony that would give the Commission information to assist it in determining what further action would be appropriate and in the public interest." The notice of hearing and order instructed U S West to file copies of "the sworn testimony and underlying data and information (including work papers)" that it intended to present at the hearing by April 8, 1998. The Commission also entered an order protecting confidential information submitted by U S West from disclosure to the public.
{4} At U S West's request, the Commission granted an extension of time that allowed U S West to prefile its testimony on April 10, 1998, and moved the hearing date back to April 21, 1998. On April 9, 1998, the Commission's staff filed its first interrogatories and requests for production of documents to U S West. The next day, U S West prefiled the direct testimony of its two witnesses, George Redding and Mary Owen. U S West filed a corrected copy of Mr. Redding's and Ms. Owen's testimony on April 13, and the filing of U S West's response to the Commission staff's first set of data requests and requests for production of documents followed the next day. On April 15, 1998, the Attorney General moved to intervene in the proceeding. The Attorney General's motion was granted the next day. On April 20, 1998, one day prior to the hearing, the Commission's staff prefiled its exhibits.
{5} At the April 21 hearing, U S West made an opening statement and presented its two witnesses, Ms. Owen and Mr. Redding, who summarized their prefiled testimony. The gist of this testimony was that U S West's overearnings in 1997 were likely to be offset by the company's anticipated losses or revenue reductions in future years. After summarizing their prefiled testimony, Ms. Owen and Mr. Redding were examined by the Commission and cross-examined by the Commission's staff and the representative from the Attorney General's office.
{6} Thereafter, the Commission's staff announced its intent to call Gary Roybal as a witness. U S West objected to Mr. Roybal's testimony on the grounds that "[w]e were not ever informed that Staff would be proposing a witness. We have not been provided any testimony.... [W]e were not advised that they would be tendering a witness in this matter. And that greatly prejudices our ability to cross-examine this witness." After a brief colloquy, the Commission ruled that "[w]e're going to have Mr. Roybal testify as a witness for [the] Staff. [The Staff] can have direct examination and the other parties will have cross-examination."
{7} On direct examination, Mr. Roybal testified regarding Staff Exhibits 1 through 4, which consisted of tables summarizing information from U S West's annual reports. Based on the information in these exhibits and the testimony presented by U S West's witnesses, Mr. Roybal concluded that "the existing rates that were approved in [Docket No.] 92-227 are no longer just and reasonable, that they are resulting in ... a rate of return that is above [the rate] authorized in that proceeding." In his testimony, Mr. Roybal also noted that U S West's earnings "going from 1995 on forward" indicated a trend toward earning more than the authorized rate of return. For this reason, Mr. Roybal recommended that the Commission adjust the rates "to a level that would result in a ... return on equity to 12.4 percent that was authorized in the last rate case." Cross-examination then ensued concerning whether the data on which Mr. Roybal's conclusions were based adequately supported his recommendation that rates be reduced, and whether the Commission had the authority to order a reduction in rates before completing all phases of a general rate case.
{8} At the conclusion of the April 21 hearing, the Commission instructed the parties to submit proposed findings of fact and conclusions of law that addressed, among other things, the issue of whether the Commission could order an immediate, interim rate reduction. The parties responded with their briefs and proposals on May 21, 1998.
{9} The day before its proposed findings and conclusions were submitted, U S West moved to disqualify Commissioner Bill Pope from hearing and deciding the matter. U S West's motion alleged that Commissioner Pope had prejudged the matter as evidenced by comments attributed to him that were *42 published in the May 11, 1998, issue of the Albuquerque Journal. The Commission denied U S West's motion to disqualify Commissioner Pope.
{10} The Commission issued its Findings of Fact, Conclusions of Law, and Order on May 29, 1998. The Commission found that, based upon the testimony of U S West's witness, Mr. Redding, at the April 21 hearing, U S West's "net revenue for 1997 exceeded [the utility's] authorized net revenue by $13.10 million," which "translates into $22,350,000 of gross revenue." The Commission also noted that, according to annual reports from prior years, U S West earned $2,821,000 in excess of its authorized earnings in 1995, and $4,267,000 in excess of its authorized earnings in 1996. According to the Commission's findings, the authorized return to total common equity for U S West in the 1992 rate case is 12.4%. In contrast, the 1997 annual report appeared to show a return to total common equity of 14.08%, and Mr. Redding testified at the April 21 hearing that U S West's return to total common equity for 1997 was actually 19.43%. Further, the Commission found that U S West's claims of anticipated losses or revenue reductions in future years was not credible because U S West had not provided sufficient data to support them and had failed to account for other significant events that could have a positive impact on the company's future earnings. The Commission found that U S West did "not have a 1998 business plan for New Mexico that supports the utility's claims that its revenue will decrease in 1998."
{11} Based on these findings, the Commission concluded that "[a] reduction in [U S West's] rates is necessary at this time so that the rates of the utility are just and reasonable," and that U S West's "rates should be reduced on an interim basis ... in the amount of $22,350,000" annually. The Commission ordered the prospective rate reduction to "be spread equally across the dial tone line rate for all [U S West] residential and business customers ." The interim rate reduction was to take effect within forty-five days of the Commission's May 28 order, and would become permanent if a rate case was not filed or otherwise ordered within sixty days. Finally, the May 29 order provided that, in the event that a rate case was filed or otherwise ordered within sixty days, the interim rates would be subject to a refund or surcharge depending on the outcome of that rate case.
{12} On June 8, 1998, U S West filed a motion for rehearing, stay pending rehearing, and vacation of the May 29 order. Among other things, U S West's motion alleged that the May 29 order is tainted by bias because the Commission's counsel, David Kaufman, had "accepted employment with a competing telecommunications firm that is a frequent adversary to [U S West]." The Commission denied U S West's motion on June 30, 1998. The case was subsequently removed to this Court pursuant to U S West's petition on August 19, 1998.

II. DISCUSSION

A. Preservation of Error

{13} Although U S West claims that the validity of the Commission's order is undermined by a lack of due process, the company does not directly challenge the sufficiency of the evidence used to support the Commission's findings. Further, with respect to U S West's due process claim, it is not disputed that the company has a constitutionally protected property interest at stake in this case. Thus, our inquiry is limited to the issue of what process is due under the circumstances. Cf. City of Albuquerque v. Chavez, 1998-NMSC-033, ¶ 10, 125 N.M. 809, 965 P.2d 928 (limiting the issue to whether the government afforded "procedural safeguards adequate to protect [the] right to due process" when the parties did not dispute that the petitioner had a constitutionally protected property interest at stake); State v. Aragon, 109 N.M. 632, 634, 788 P.2d 932, 934 (Ct.App.1990) (holding that issues not addressed in an appellant's brief will be deemed abandoned).
{14} U S West made timely objections and fairly invoked a ruling from the Commission on the due process questions of insufficient notice, the admission of Mr. Roybal's testimony, the alleged prejudgment of Commissioner Pope, the alleged bias of the Commission's counsel, and the Commission's authority *43 to order a rate reduction without all the trappings of a general rate case. All of these issues are addressed in the Commission's orders, and we determine that they were adequately preserved for appellate review. See Rule 12-216(A) NMRA 1999.

B. Standard of Review

{15} In reviewing the Commission's orders, we are mindful that "this Court is not a ratemaking body," and "`[w]e recognize the expertise of the Commission in public utility management.'" U S West 1995, 121 N.M. at 161, 909 P.2d at 721 (quoting Burlington N. R.R. v. Corporation Comm'n (In re Burlington N. R.R.), 107 N.M. 582, 584, 761 P.2d 855, 856 (1988)) (alteration in original). Nevertheless, the question of due process that we address in this appeal requires our independent judgment. See U S West Communications, Inc. v. New Mexico State Corp. Comm'n (In re Rates and Charges of U S West Communications, Inc.), 116 N.M. 548, 549, 865 P.2d 1192, 1193 (1993) [hereinafter U S West 1993] (applying independent judgment to question of constitutional construction). The Commission's rulings on the threshold issue of whether U S West was afforded the process it is due under the Fourteenth Amendment to the United States Constitution are subject to de novo review. See State v. Attaway, 117 N.M. 141, 145, 870 P.2d 103, 107 (1994) (applying de novo review to mixed questions of law and fact that arise in the context of threshold constitutional issues); see also Farmland Indus., Inc. v. State Corp. Comm'n, 24 Kan.App.2d 172, 943 P.2d 470, 479 (1997).

C. Commission's Authority to Order Interim Rate Relief

{16} We first address U S West's assertion that the Commission lacked the authority to decrease rates before the completion of a general rate case.[2] This assertion lacks merit. "Our prior decisions have established the principle that the Commission has a wide degree of discretion in its rate-making authority. In fact, `[i]t is difficult to conceive of a more clear and all-inclusive grant of power to a government agency'" than the grant of ratemaking power found in Article XI, Section 7 of the New Mexico Constitution. U S West 1995, 121 N.M. at 161, 909 P.2d at 721 (quoting Mountain States Tel. & Tel. Co. v. New Mexico State Corp. Comm'n, 90 N.M. 325, 331, 563 P.2d 588, 594 (1977) [hereinafter Mountain States 1977]). We also have recognized the "`elementary rule of law that the power to grant a particular relief carries with it all the incidental, necessary, and reasonable authority to grant that which is less.'" Mountain States 1977, 90 N.M. at 335, 563 P.2d at 598 (quoting Pacific Tel. & Tel. Co., 78 Pub. Util. Rep. New Series (PUR) 491, 493 (Cal. Pub. Utils. Comm'n 1949)). Thus, the Commission's ratemaking authority "`carries with it the incidental and implied power to grant interim rate relief, if the facts warrant such summary relief.'" Id. (quoting Pacific Tel. & Tel. Co., 78 Pub. Util. Rep. New Series (PUR) at 493); cf. U S West 1993, 116 N.M. at 551, 865 P.2d at 1196 (concluding that the Commission's authority to suspend proceedings can be implied from its broader, express power to dismiss proceedings). See generally Stefan H. Krieger, The Ghost of Regulation Past: Current Applications of the Rule Against Retroactive Ratemaking in Public Utility Proceedings, 1991 U. Ill. L.Rev. 983, 1012 n. 163 (listing other states that rely on inherent authority to set interim rates subject to surcharge or refund).
{17} When it was determined that an applicant for a rate increase "was losing over one million dollars per month considering what had been determined to be its fair rate of return" and "it became obvious that it would be a considerable length of time before permanent rates could be fixed," this Court concluded that the Commission "had a constitutional duty to fix interim rates that would minimize the confiscation of [the applicant's] property." Mountain States 1977, 90 N.M. at 335-36, 563 P.2d at 598-99. It is not unreasonable to infer that the Commission *44 would have a similar power to commence an investigation and order an interim reduction in rates for the benefit of ratepayers when a significant regulatory lag threatens its ability to ensure that rates are just and reasonable. Cf. Pueblo Del Sol Water Co. v. Arizona Corp. Comm'n, 160 Ariz. 285, 772 P.2d 1138, 1140 (App.1988) (rejecting a utility's argument that interim rates may be made subject to increase, but not decrease, as an effort "to have [one's] cake and eat it too"); United Tel. Co. v. Mann, 403 So.2d 962, 966 (Fla.1981) (concluding that "there is no logical reason for distinguishing between rate increase proceedings and rate decrease proceedings" in the context of determining a commission's authority to order interim relief); Florida Power Corp., 8 Pub. Util. Rep. 4th (PUR) 95, 97 (Fla. Pub. Serv. Comm'n 1975) ("[I]t is illogical to contend that one segment of the utility industry ... may receive interim relief while another must be required to operate under unreasonable or unfair rates while the lengthy regulatory process runs its course."); Farmland Indus., Inc., 943 P.2d at 481 (concluding that a commission's "power to establish and maintain just and reasonable rates is not limited to increasing rates").
{18} U S West contends that we cannot make such an inference in favor of an interim rate reduction in this case because, unlike U S West, neither the government nor the ratepayers have a liberty or property interest at stake that is entitled to the substantive and procedural protections afforded by the Due Process Clause. While it is true that no individual ratepayers are parties to this case and the government is not a "person" within the meaning of the Due Process Clause, see City of Albuquerque v. Chavez, 1997-NMCA-054, ¶ 12, 123 N.M. 428, 941 P.2d 509, it does not follow that the Commission is without authority to protect the interests asserted by its staff and the Attorney General under these circumstances, cf. id. ¶¶ 13-14 (concluding that a municipal ordinance prohibiting arbitrary and capricious actions affords the government the same right to a fair hearing that is guaranteed to persons under the Due Process Clause); Las Cruces Prof'l Fire Fighters v. City of Las Cruces, 1997-NMCA-031, n. 3, 123 N.M. 239, 938 P.2d 1384 (same). In their terms and in their structure, the ratemaking provisions in our state constitution at the time of this proceeding require the Commission to balance the interests asserted by U S West and the interests asserted on behalf of ratepayers to arrive at a rate that is "reasonable and just." N.M. Const. art. XI, § 7; see U S West 1993, 116 N.M. at 551, 865 P.2d at 1195. "Neither [interest] is paramount." Mountain States Tel. & Tel. Co. v. Corporation Comm'n (In re Rates and Charges of Mountain States Tel. & Tel. Co.), 99 N.M. 1, 7, 653 P.2d 501, 507 (1982) [hereinafter Mountain States 1982].
{19} Further, the Commission's authority to initiate a rate investigation, order an interim reduction in rates, and employ methods of rate control other than a general rate case is consistent with the law in other jurisdictions. See generally National Association of Regulatory Utility Commissioners, Utility Regulatory Policy in the United States and Canada: Compilation 1993-1994, at 24, 35-43 tbls.9-13 (1995). Indeed, U S West has been a party to such an interim rate reduction in at least one other jurisdiction, see U S West Communications, 114 Pub. Util. Rep. 4th (PUR) 174 (Utah Pub. Serv. Comm'n 1990), and we recognize that the fashioning of such interim relief may "achieve a practical solution to the increasingly vexing rate regulation problem of regulatory lag," Chesapeake & Potomac Tel. Co. v. Public Serv. Comm'n, 330 A.2d 236, 242 (1974). For these reasons, we conclude that the Commission had the power to grant interim rate relief.

D. Departure from Past Commission Practice

{20} U S West next contends that the Commission's method of granting interim rate relief in this case constitutes "an arbitrary and capricious departure from past Commission practice without proper notice and reasonable justification in the record." Mountain States Tel. & Tel. Co. v. New Mexico State Corp. Comm'n (In re Rates and Charges of Mountain States Tel. & Tel. Co.), 104 N.M. 36, 42, 715 P.2d 1332, 1338 (1986) [hereinafter Mountain States 1986]. While it is perhaps true that interim rate *45 decreases are less common than interim rate increases, see Krieger, supra, at 1014, we do not agree with U S West that the reduction ordered in this case is so arbitrary and unprecedented as to deprive U S West of its constitutional right to due process, see Consumers Power Co. v. Michigan Pub. Serv. Comm'n, 226 Mich.App. 12, 572 N.W.2d 222, 230 (1997) (rejecting the argument that conditional approval of a rate adjustment constituted an "arbitrary change in ratemaking methods contrary to reasonable expectations and reliance of investors").
{21} Our conclusion follows from the application of the balancing test adopted in Hobbs Gas Co. v. New Mexico Pub. Serv. Comm'n, 115 N.M. 678, 682, 858 P.2d 54, 58 (1993). This test calls for consideration of the following factors:
"(1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard."
Id. (quoting Retail, Wholesale & Department Store Union v. NLRB, 466 F.2d 380, 390 (D.C.Cir.1972)).
{22} The issue of interim rate relief is not one of first impression because the Court previously recognized the Commission's constitutional authority to grant such relief in Mountain States 1977, 90 N.M. at 335-36, 563 P.2d at 598-99, and U S West has not shown that the Commission has ever had a specific policy against interim rate decreases. Thus, the order at issue is not an abrupt departure from established practice but, instead, an attempt to fill a gap in the law where there is a pattern of earnings showing a likelihood that a utility will continue to grossly exceed an established, reasonable rate of return. Further, given the precedent establishing the Commission's constitutional authority to grant interim rate relief and the absence of any established policy against using that authority to order an interim reduction in rates, we cannot conclude that U S West reasonably relied to its detriment on the assumption that the Commission could not act to enforce the rate of return established in U S West's 1992 rate case through a subsequent order requiring an interim decrease in rates.
{23} U S West has been afforded an opportunity to recoup losses occasioned by the interim rate reduction if that reduction is later determined to be unjustified, and we have not required the company to comply with the Commission's order while this removal action is pending. Under these circumstances, we cannot say that the burden imposed on U S West by the Commission's order is of a sufficiently high degree to outweigh the Commission's significant interest in assuring reasonable and just rates under Article XI, Section 7 of the New Mexico Constitution. For these reasons, we reject U S West's contention that the Commission's order is an unlawful departure from its past practices.

E. Due Process Requirements for Interim Rate Changes

{24} Our conclusion that the Commission has the power to grant interim rate relief does not mean that the Commission may exercise this power without affording due process to U S West. See Virginia Elec. & Power Co. v. State Corp. Comm'n, 226 Va. 541, 312 S.E.2d 25, 28-30 (1984) (finding a violation of due process when a utility "was unaware that summary action was under consideration" and had "no opportunity to be heard"). In particular, the fact that the deprivation of property occasioned by the Commission's order may be only interim or temporary in nature does not provide a justification for bypassing the Due Process Clause. See Fuentes v. Shevin, 407 U.S. 67, 84-85, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); see also Montoya v. Blackhurst, 84 N.M. 91, 93, 500 P.2d 176, 178 (1972). "Thus, the Commission has ... to temper the laudable objective of prompt and uncomplicated resolution of rate cases with a healthy concern for the protection of the rights of participants to a full and proper hearing." Virginia *46 Elec. & Power Co., 101 Pub. Util. Rep. 4th (PUR) 41, 44 (Va. State Corp. Comm'n 1988); cf. Santa Fe Exploration Co. v. Oil Conservation Comm'n, 114 N.M. 103, 109, 835 P.2d 819, 825 (1992) (noting that "[d]ue process safeguards are particularly important in administrative agency proceedings because `many of the customary safeguards affiliated with court proceedings have, in the interest of expedition and a supposed administrative efficiency, been relaxed'" (quoting Reid v. New Mexico Bd. of Exam'rs in Optometry, 92 N.M. 414, 416, 589 P.2d 198, 200 (1979))).
{25} Our prior decisions have recognized that "[i]n administrative proceedings due process is flexible in nature and may adhere to such requisite procedural protections as the particular situation demands." State ex rel. Battershell v. City of Albuquerque, 108 N.M. 658, 662, 777 P.2d 386, 390 (Ct.App.1989) (citing Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)); accord Mathews v. Eldridge, 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) ("`[D]ue process ... is not a technical conception with a fixed content unrelated to time, place and circumstances.'" (citation omitted)); Mills v. New Mexico State Bd. of Psychologist Exam'rs, 1997-NMSC-028, ¶ 19, 123 N.M. 421, 941 P.2d 502 ("Procedural due process requirements are not static, and the extent of the hearing required is determined on a case by case basis."); New Mexico Indus. Energy Consumers v. New Mexico Pub. Serv. Comm'n, 104 N.M. 565, 568, 725 P.2d 244, 247 (1986) ("[D]ue process is a flexible concept whose essence is the right to be heard at a meaningful time and in a meaningful manner."). We take this flexible approach because "interests must be balanced to determine what notice is required in a particular situation," Farmland Indus., Inc., 943 P.2d at 479 (citing Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950)), and because we recognize that an administrative body may carry out executive or legislative functions in addition to its quasi-judicial role, see Board of Educ. v. New Mexico State Bd. of Educ., 106 N.M. 129, 132, 740 P.2d 123, 126 (Ct.App.1987); Krieger, supra, at 1036-37.
{26} Our determination of what process is due in an administrative proceeding results from a balancing of (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Mathews, 424 U.S. at 335, 96 S.Ct. 893. In balancing these factors, we consider the "proceedings as a whole." Chavez, 1998-NMSC-033, ¶ 14, 125 N.M. 809, 965 P.2d 928; see also Mitchell v. W.T. Grant Co., 416 U.S. 600, 610, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974).
{27} Viewed from this perspective, we find it significant that U S West's property interest in a ratemaking proceeding has been characterized as a right to assess rates that "provide a reasonable rate of return," Mountain States 1977, 90 N.M. at 334, 563 P.2d at 597, and in this case the Commission employed the rate of return that was previously established as a result of a full-blown rate case in 1992. In addition, U S West was afforded the opportunity to seek modification of the Commission's May 29 order within sixty days, and to impose a surcharge to recoup any losses that were later determined to be unjustified. Cf. GTE Sprint Communications Corp. v. AT & T Communications, 230 Va. 295, 337 S.E.2d 702, 707 (1985) (concluding that a full and fair hearing on all issues relevant to a permanent compensation plan "has not been denied but has merely been deferred" by an order granting interim relief). This special opportunity for modification of the Commission's order differs from the more general opportunity to file a rate case at any time because only the former includes the possibility of imposing a surcharge to recoup unjustified past losses. Compare Mountain States 1977, 90 N.M. at 341, 563 P.2d at 604 (suggesting that the Commission ordinarily cannot order "[r]etroactive remedies" in a general rate case), with Friends of the Earth v. Public Serv. Comm'n, 78 Wis.2d 388, 254 N.W.2d 299, 309 *47 (1977) (concluding that when an interim order is conditioned on "the possibility that a refund [or surcharge] may be required, the [commission] may be deemed to have retained with the consent of the utility the power to issue an order relating back to the interim order") (footnote omitted). See generally Krieger, supra, at 1012-15 (discussing different approaches to making interim rates subject to refund or surcharge). Also, under the terms of Article XI, Section 7 of the New Mexico Constitution, U S West has not been required to comply with the rate reduction ordered by the Commission while its removal action has been pending in this Court. These provisions for modification and further review of the Commission's order prior to the enforcement of the rate reduction decrease the risk of an erroneous deprivation of U S West's constitutionally protected property interests. See GTE Sprint Communications Corp., 337 S.E.2d at 707-08.
{28} Moreover, the alternative procedural requirement suggested by U S West, namely the completion of a general rate case before any type of rate reduction can be ordered, would impose a significant fiscal and administrative burden on the Commission. Such a burden could impair the Commission's ability to carry out its constitutionally mandated function of ensuring that telephone rates are "reasonable and just." N.M. Const. art. XI, § 7. "`A construction of the Due Process Clause which would place impossible or impractical obstacles in the way [of the State reaching a final decision] could not be justified.'" Farmland Indus., Inc., 943 P.2d at 479 (quoting Mullane, 339 U.S. at 313-14, 70 S.Ct. 652) (alteration in original). For these reasons, we determine that the Commission did not violate U S West's constitutional right to due process by granting interim rate relief without all the trappings of a general rate case.

F. Notice of Hearing

{29} When the question of the enforcement of a permanent rate change is deferred pending further review and the initial proceeding is thus confined to the question of interim rate relief, "the exigencies of the situation may justify a more limited presentation by the utility and opposing parties." Friends of the Earth, 254 N.W.2d at 304. Nevertheless, the notice required in such proceedings "should be more than a mere gesture; it should be reasonably calculated, depending upon the practicalities and peculiarities of the case, to apprise interested parties of the pending action and afford them an opportunity to present their case." Farmland Indus., Inc., 943 P.2d at 479.
{30} U S West contends that the Commission's notice in this case failed to meet this standard under the reasoning articulated by this Court in Mountain States 1977, 90 N.M. at 339-40, 563 P.2d at 602-03. We disagree. Unlike the "1973 order" at issue in Mountain States 1977, the Commission's notice in this case reasonably informed U S West of the type of evidence on which the Commission intended to rely in reaching its decision. In particular, the Commission's notice announced that (1) the Commission would "conduct an investigation," (2) the subject of the investigation would be whether U S West "is earning a return in excess of the authorized return on rate base of 10.85% and the authorized return on equity of 12.4% set by the Commission in Docket No. 92-227-TC," and (3) the purpose of the investigation would be to assist the Commission "in determining what further action would be appropriate and in the public interest." The Commission's order was based on the subject matter identified in the notice and the evidence introduced at the hearing, as required by the Due Process Clause. Cf. National Council on Compensation Ins. v. New Mexico State Corp. Comm'n, 107 N.M. 278, 284, 756 P.2d 558, 564 (1988) [hereinafter "NCCI"] (concluding that there was no due process violation when the notice reasonably informed the parties of the matters to be addressed at the hearing so that they were able to meet the issues involved).
{31} U S West also contends that the Commission's use of the phrase "further action" is too vague and indefinite to provide notice of an impending change in its rates. Given the context in which these words appear, we disagree with this contention. It is not unprecedented for utility regulators to initiate a rate change by "conduct[ing] an *48 investigation." See National Association of Regulatory Utility Commissioners, supra, at 40 tbl. 12 (listing states, including New Mexico, where utility regulators have the authority to initiate rate investigations upon their own motion); Krieger, supra, at 993 ("Changes in rates can be initiated by ... the institution of an investigatory proceeding by the commission with jurisdiction over the utility...."). Likewise, it is not unprecedented for an interim rate reduction to follow from a finding that a utility has a pattern of overearning. See, e.g., Mann, 403 So.2d at 966 (concluding that "the commission is authorized to order interim rate decreases upon finding that a company is earning revenues in excess of its maximum allowable rate of return"); U S West Communications, Inc., 114 Pub. Util. Rep. 4th (PUR) at 176, 181 (ordering U S West to "reduce its rates and charges" in Utah on an interim basis after finding that the company "has earned in excess of the allowed rate of return each year since 1986"); cf. Krieger, supra, at 1005-07 (discussing exceptions to the rule against retroactive ratemaking in cases of extraordinary gains by utilities). Under these circumstances, U S West "is charged with knowledge that the Commission [had authority] to take action to eliminate unjust and unreasonable rates." Commonwealth Gas Pipeline Corp. v. Anheuser-Busch Cos., 233 Va. 396, 355 S.E.2d 605, 609-10 (1987).
{32} For these reasons, U S West is not entitled to rely on the legally incorrect assumption that the Commission's only options were to await the completion of a general rate case or do nothing. See id. When taken in the context of the Commission's initiation of an investigation and U S West's knowledge of the subject of that investigation, we conclude that the Commission's reference to "further action" provided U S West with sufficient notice that an interim rate change was contemplated. Cf. NCCI, 107 N.M. at 284, 756 P.2d at 564 (reasoning that there would be no violation of due process "if, in addition to statutory notice, a party had actual knowledge of the details to be inquired into at the hearing").
{33} We recognize that "due process could be denied where [the required] notice, although technically adequate, was shown to mislead or prejudice the complaining party." Id. In this case, however, we find nothing misleading or prejudicial about the notice provided to U S West. In addition to affording U S West the opportunity to address the central factual issue of the propriety of its earnings at the April 21 hearing, the Commission gave U S West an additional opportunity to brief the legal questions concerning the Commission's authority to impose an interim rate reduction when those legal questions came into focus at the end of the hearing. Under these circumstances, the fact that the Commission's authority to order an interim rate reduction may not have been addressed until the end of the hearing does not render the initial notice insufficient. See Industrial Utils. Serv., Inc. v. Texas Natural Resource Conservation Comm'n, 947 S.W.2d 712, 717 (Tex.Ct.App.1997) (finding no violation of due process where the utility had an adequate opportunity to respond to an issue that was not raised until closing argument and to reopen the record to present additional evidence concerning this issue); Farmland Indus., Inc., 943 P.2d at 481-82 (concluding that notice was sufficient even though there was a change in the nature of the proceedings when "the general description of the purpose of the proceeding did not become inaccurate or misleading"); cf. NCCI, 107 N.M. at 284, 756 P.2d at 564 (declining to require "the Superintendent [of Insurance] to specifically notify the rate maker of all issues which may arise during the hearing").

G. Opportunity to Cross-Examine Staff Witness

{34} We also determine that the admission of Mr. Roybal's testimony over U S West's objection did not deprive U S West of due process. It is not uncommon for the Commission's telecommunications staff to present witnesses at a hearing before the Commission. See, e.g., U S West 1995, 121 N.M. at 163-64, 909 P.2d at 723-24 (noting testimony of a staff witness); Mountain States 1986, 104 N.M. at 40, 715 P.2d at 1336 (same); Mountain States 1982, 99 N.M. at 8, 653 P.2d at 508 (same).
*49 {35} In this case, the Commission's staff first announced that Mr. Roybal was in attendance as a staff witness when entering its appearance at the beginning of the hearing. When U S West later objected to the admission of Mr. Roybal's testimony, the Commission's staff responded that "basically, Staff is taking this opportunity to present its comments in a similar manner as other parties here, but through the witness." U S West then proposed to allow Mr. Roybal to make a statement in the same manner as other comments from the public, but noted that "if it's going to be sworn and on the record, it needs to be subject to cross-examination, that's all." Commissioner Block, who was serving as the hearing officer, then stated: "I just don't know where you're coming from. ... [O]n one hand you don't want cross-examination because you haven't had time to review it, and on the other hand you want to cross-examine him in case he says something you don't agree with. We've got to do it one way or the other." Under these circumstances, we believe the Commission was correct in requiring Mr. Roybal to testify under oath subject to cross-examination by U S West. Cf. Battershell, 108 N.M. at 662, 777 P.2d at 390 (finding reversible error in an administrative body's decision not to allow parties to cross examine opposing witnesses in a zoning hearing).
{36} Having afforded U S West this procedural safeguard, however, we do not find that U S West was deprived of an adequate opportunity to question Mr. Roybal and to defend against the claims he made in his testimony. Apart from making the type of "general comments and policy comments" to which U S West did not object, Mr. Roybal's testimony was limited to summarizing and making inferences from the evidence that U S West had already submitted to the Commission. The staff exhibits on which he relied to summarize the data from U S West's annual reports had been prefiled by the Commission's staff the day before the hearing. As such, Mr. Roybal's testimony did not rely on any new evidence that was not available to U S West prior to the hearing.
{37} Further, U S West has not shown how it was unfairly prejudiced by the admission of Mr. Roybal's testimony, or how the risk of error in the proceedings would have been reduced by excluding this testimony. See Mathews, 424 U.S. at 335, 96 S.Ct. 893 (noting that "identification of the specific dictates of due process generally requires consideration of ... the probable value, if any, of additional or substitute procedural safeguards"); Helen F. v. State ex rel. Human Servs. Dep't (In re Kenny F.), 109 N.M. 472, 475, 786 P.2d 699, 702 (Ct.App.1990) (concluding that there is no violation of due process when a party is able to cross-examine an opponent's expert witness and "makes no showing of how that cross-examination was impeded by the alleged delayed disclosure of the [expert's] report"). We note that U S West did not take advantage of existing procedures for discovering evidence in the possession of the Commission's staff prior to the hearing, nor did the company request a less drastic remedy such as granting a continuance to provide more time to prepare for the cross-examination of Mr. Roybal. See In re Kenny F., 109 N.M. at 475, 786 P.2d at 702 ("It is not reversible error to refuse to impose [the] drastic sanction [of striking the witness's testimony] even though a less severe remedy, such as a continuance, may have been warranted if requested.").
{38} Finally, U S West made no showing of what additional evidence or rebuttal it would have presented at the hearing if it had been afforded better notice of Mr. Roybal's testimony. From our review of the record, it appears that U S West was able to use its cross-examination of Mr. Roybal to make the argument that the Commission lacked the authority to immediately order an interim rate reductionan issue which the Commission gave the parties an additional opportunity to address in writing after the conclusion of the hearing. In addition, it appears that U S West was able to effectively cross-examine Mr. Roybal concerning both his methodology and his conclusions. Under these circumstances, we find no violation of due process in the admission of Mr. Roybal's testimony.

*50 H. Bias or Prejudgment

{39} U S West also contends that its constitutional right to due process was violated because the Commission's decision to order an interim rate reduction was tainted by bias and prejudgment on the part of Commissioner Pope and the Commission's counsel, Mr. Kaufman. We first address the allegations of prejudgment that pertain to Commissioner Pope. These allegations arise from the publication of an article in the May 11, 1998, issue of the Albuquerque Journal that quoted Commissioner Pope as saying that: "The Commission is trying to get the phone rates reduced for the consumer without it costing the state or U S West a whole lot of money in a full-blown rate case." The Journal article also paraphrased Commissioner Pope's remarks as reflecting a belief that a rate reduction was "warranted."
{40} We have instructed the Commission that "comments by a Commissioner which constitute prejudgment may constitutionally taint any subsequent hearing so as to invalidate the ensuing order of the Commission." Mountain States 1982, 99 N.M. at 7, 653 P.2d at 507 (interpreting language in N.M. Const. art. XI, § 8 that requires the Commission to "determine no question nor issue any order... until after a public hearing"). We have also stated that "prehearing statements [indicating an absence of fairness and impartiality] reflect poorly on the rate setting process." Id. We do not retreat from those admonitions today.
{41} Nevertheless, we recognize that not all allegations of bias or prejudice are of the type that render a proceeding fundamentally unfair or require the disqualification of a decisionmaker. See Liteky v. United States, 510 U.S. 540, 550, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) ("Not all unfavorable disposition[s] towards an individual (or his case) [are] properly described by" the words "bias or prejudice."); see also In re J.P. Linahan, Inc., 138 F.2d 650, 654 (2d Cir.1943) ("Impartiality is not gullibility."); Las Cruces Prof'l Fire Fighters, 1997-NMCA-031, ¶ 24, 123 N.M. 239, 938 P.2d 1384, (listing types of bias and their relationship to disqualification under the framework established in 3 Kenneth Culp Davis, Administrative Law Treatise § 19:1, at 371-72 (2d ed.1980)). We also recognize that in addition to its quasi-judicial role, an administrative body may carry out executive or legislative functions that require it to be "open and responsive to its constituency." Board of Educ., 106 N.M. at 132, 740 P.2d at 126; see also Krieger, supra, at 1036-37 (noting that ratemaking may involve a mixture of legislative and adjudicative procedures). Thus, we cannot invalidate all administrative decision-making simply because a member of an administrative body has communicated with his or her constituents through the media.
{42} In determining whether a commissioner's remarks constitute prejudgment sufficient to violate U S West's constitutional right to due process, "[t]he inquiry is not whether the [commission]ers are actually biased or prejudiced, but whether, in the natural course of events, there is an indication of a possible temptation to an average [person] sitting as a judge to try the case with bias for or against any issue presented to him [or her]." Reid, 92 N.M. at 416, 589 P.2d at 200. This inquiry measures allegations of bias or prejudice by an objective standard that
is in essence a paraphrase of a federal statute governing the disqualification of judicial branch judges, see 28 U.S.C. § 455(a) (1994) (A judge "shall disqualify himself [or herself] in any proceeding in which his [or her] impartiality might reasonably be questioned."), as well as New Mexico's Code of Judicial Conduct dealing with disqualification of state judges, see [Rule 21-400(A) NMRA 1999] ("A judge is disqualified and shall recuse himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned ....").
Chavez, 1997-NMCA-054, ¶ 16, 123 N.M. 428, 941 P.2d 509 (alteration in original); see also Liteky, 510 U.S. at 543-48, 114 S.Ct. 1147 (recounting history of federal recusal statutes).
{43} Applying this objective standard, we determine that U S West's allegations of prejudgment by Commissioner Pope do not amount to a violation of U S West's constitutional right to due process. Unlike the decisionmaker in Reid, 92 N.M. at 415, *51 589 P.2d at 199, Commissioner Pope did not admit to making the statements quoted and paraphrased in the Journal article. Rather, he noted that the article "did not accurately present my thinking on the issues in this case. I had reached no definite conclusions concerning this case at that time." Moreover, the statements attributed to Commissioner Pope were made after U S West's hearing, not before it.
{44} Interpreting the federal statute quoted in Chavez, 941 P.2d 509 1997-NMCA-054, ¶ 16, 123 N.M. 428, the United States Supreme Court has reasoned:
[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of the trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.
Liteky, 510 U.S. at 555, 114 S.Ct. 1147; cf. Las Cruces Prof'l Fire Fighters, 1997-NMCA-031, ¶ 23, 123 N.M. 239, 938 P.2d 1384 (directing against an inference that "a member of a tribunal is necessarily disqualified whenever prior conduct of the member indicates a view that would favor one party or the other"). Under this reasoning, the remarks attributed to Commissioner Pope do not require his disqualification. U S West has not shown that these remarks were based on information obtained by Commissioner Pope outside the course of the proceedings, and the timing of the remarks would suggest that they were based on the evidence and arguments that he gleaned from the April 21 hearing. Further, the remarks do not suggest a "deep-seated favoritism or antagonism that would make fair judgment impossible." Liteky, 510 U.S. at 555, 114 S.Ct. 1147. Thus, we will not vacate the Commission's order because of the remarks attributed to Commissioner Pope in the Albuquerque Journal.
{45} We also conclude that the allegations of bias on the part of the Commission's counsel, Mr. Kaufman, are too tenuous to support the conclusion that U S West's constitutional right to due process was violated. U S West alleges that Mr. Kaufman influenced the Commission in a biased manner because he accepted an offer of employment from one of U S West's competitors, e.spire Communications, Inc., during the pendency of the proceedings. According to an affidavit filed by Mr. Kaufman, he was offered employment by e.spire Communications, Inc. on May 7, 1998, but did not participate personally or substantially in any matters in which e.spire was a party while negotiating for employment with e.spire or after his acceptance of the company's offer.
{46} With respect to Mr. Kaufman's employment negotiations with e.spire, U S West alleges a type of bias that may warrant disqualification. An offer of employment carries with it an economic incentive that may place its recipient in a position where he or she "`stands to gain or lose by a decision'" affecting the future employer. See Las Cruces Prof'l Fire Fighters, 1997-NMCA-031, ¶ 24, 123 N.M. 239, 938 P.2d 1384 (quoting 3 Davis, supra, § 19:1, at 371). Although disqualification is not limited to instances where a lawyer has violated an ethical or specific court rule, see Sanders v. Rosenberg, 1997-NMSC-002, ¶¶ 8, 10, 122 N.M. 692, 930 P.2d 1144, the Rules of Professional Conduct governing conflicts of interest may provide examples of the types of bias that may warrant disqualification, see, e.g., Rule 16-111 NMRA 1999 (governing successive government and private employment of lawyers); Rule 16-112 NMRA 1999 (governing future employment of judges, other adjudicative officers, arbitrators and law clerks); State v. Barnett, 1998-NMCA-105, ¶¶ 15-16, 125 N.M. 739, 965 P.2d 323 (interpreting Rule 16-111(C) and Rule 16-109 NMRA 1999 to determine grounds for disqualification of an attorney).
{47} In determining whether Mr. Kaufman's relationship with e.spire had the effect of depriving U S West of its right to due process, we find the authorities addressing bias or prejudice in the context of employment *52 negotiations by a judge's law clerk to be instructive. See Hamid v. Price Waterhouse, 51 F.3d 1411, 1416-17 (9th Cir.1995); Milgard Tempering, Inc. v. Selas Corp. of Am., 902 F.2d 703, 714 (9th Cir.1990); Hunt v. American Bank & Trust Co., 783 F.2d 1011, 1015-16 (11th Cir.1986); Hall v. Small Bus. Admin., 695 F.2d 175, 179 (5th Cir.1983). We note that these authorities use the familiar objective standard for determining bias or prejudice that New Mexico courts have employed for many years. Compare Chavez, 1997-NMCA-054, ¶ 16, 123 N.M. 428, 941 P.2d 509 (noting that New Mexico's standard "is in essence a paraphrase of" 28 U.S.C. § 455(a)), with Hamid, 51 F.3d at 1416 (applying 28 U.S.C. § 455(a) to allegations of bias arising from employment negotiations of a judge's law clerk), and Milgard Tempering, Inc., 902 F.2d at 714 (same). Also, for purposes of argument, we will assume that like a judge's law clerk, Mr. Kaufman may have acted as a sounding board for the commissioners' tentative opinions and a legal researcher who sought the authorities that would affect their decisions. See Hall, 695 F.2d at 179.
{48} Given these duties, "[a] reasonable person might be concerned whether a law clerk's advice to a judge would be biased in favor of the position taken by a firm, if the law clerk had worked there before his clerkship, was on a leave of absence, and planned to work there after his clerkship." Hamid, 51 F.3d at 1416-17. But cf. Rule 16-112(B) ("A lawyer serving as a law clerk to a judge, other adjudicative officer or arbitrator may negotiate for employment with a party or attorney involved in a matter in which the clerk is participating personally or substantially, but only after the lawyer has notified the judge, other adjudicative officer or arbitrator."). For the same reason, a reasonable person might question Mr. Kaufman's impartiality with respect to a firm for which he agreed to work after completing his duties with the Commission.
{49} On the other hand, "[w]e do not believe that a law clerk's acceptance of future employment with a law firm would cause a reasonable person to doubt the judge's impartiality so long as the clerk refrains from participating in cases involving the firm in question." Milgard Tempering, Inc., 902 F.2d at 714 (quoting Hunt, 783 F.2d at 1016). For the same reason, we do not believe that Mr. Kaufman's acceptance of future employment with e.spire would cause a reasonable person to doubt the Commission's impartiality so long as Mr. Kaufman refrained from participating in cases involving his future employer.
{50} The question, then, is whether the present case is one that involves Mr. Kaufman's future employer. We conclude that it is not.
The question of bias is one of whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned. It is not a question of whether a line can be drawn connecting a person within chambers to a person or firm related, no matter how remotely, to a party in the case.
Hamid, 51 F.3d at 1417. In this case, U S West draws a line between Mr. Kaufman and e.spire and then alleges an adverse or competitive relationship between e.spire and U S West. Because e.spire is not a party to this case, and U S West fails to show a substantial relationship between this case and any other case in which e.spire was a party during the relevant time period, we determine that the relationship among e.spire, Mr. Kaufman, the Commission, and U S West is too remote to place the Commission's impartiality in question here. Cf. Barnett, 1998-NMCA-105, ¶¶ 16-22, 125 N.M. 739, 965 P.2d 323 (discussing factors relevant to determining whether a government attorney represented a party adverse to a former client "in the same or a substantially related matter" in violation of Rule 16-109 NMRA 1999). In sum, none of U S West's challenges to the sufficiency of the notice it was given, or the adequacy of its opportunity to be heard, or the Commission's impartiality, persuade us that the company was deprived of the process it is due in this case. Therefore, we affirm the Commission's order.

I. Effective Date of Commission's Order.

{51} Our decision to affirm the Commission's May 29 order gives rise to the question *53 of its effective date. In their answer briefs, the Attorney General and the Commission's staff assert that if we affirm the Commission's order, we may order U S West to treat the rate reduction as if it went into effect on July 13, 1998 (the date ordered by the Commission), notwithstanding the fact that this date has already passed. U S West responds that we cannot require the Commission's order to be treated as if it had taken effect on that date because such a requirement would violate Article XI, Section 7 of the New Mexico Constitution, the filed-rate doctrine, and the rule against retroactive ratemaking.
{52} The parties acknowledge that this Court has recognized a prohibition against retroactive ratemaking in Mountain States 1977, 90 N.M. at 341, 563 P.2d at 604. After vacating an order of the Commission and determining that interim rate relief was warranted in that case, we addressed the question of whether the effective date of such relief could predate the Court's order. See id. at 336, 341, 563 P.2d at 596, 604. We concluded that it could not. New Mexico is not alone in reaching this conclusion, see Krieger, supra, at 1022 n. 214 (identifying New Mexico as among jurisdictions that apply the rule against retroactive ratemaking in this context), and, in fact, it appears that courts are evenly divided on the issue, see id. at 1022.
{53} The rationale behind our application of the rule against retroactive ratemaking in the context of Mountain States 1977 was that ratemaking "is legislative in its nature, and it is axiomatic that legislative action operates prospectively, not retroactively." 90 N.M. at 341, 563 P.2d at 604 (citation omitted).[3] It follows that "only commissions, not the courts, can engage in ratemaking." Krieger, supra, at 1023 & n. 222 (citing Public Serv. Comm'n v. Diamond State Tel. Co., 468 A.2d 1285, 1298 (Del.1983)). Many of our past decisions have relied on this reasoning. See, e.g., U S West 1995, 121 N.M. at 161, 909 P.2d at 721 ("[T]his Court is not a ratemaking body."); Mountain States 1982, 99 N.M. at 7, 653 P.2d at 507 ("We do not set rates...."); State Corp. Comm'n v. Mountain States Tel. & Tel. Co., 58 N.M. 260, 266, 270 P.2d 685, 689 (1954) ("We do not have the power or authority to determine what a fair actual rate is."). If only the Commission, and not this Court, has the power to engage in ratemaking, it follows that only the Commission, and not this Court, can change rates after this Court vacates a prior order of the Commission and remands the matter for further proceedings.
{54} The same conclusion does not necessarily follow when the Court affirms an order of the Commission. In that situation, it is not necessary for the Commission to engage in additional ratemaking because the Court's action merely serves to enforce the rates set in the order it affirms. Under this rationale, when the Court affirms the Commission's order, the rule against retroactive ratemaking provides no obstacle to giving effect to that order as of the date provided therein, particularly when the rates set by the order would have gone into effect at that time but for the filing of a removal action. See Krieger, supra, at 1023-24.
{55} U S West contends that there are other obstacles, however. First, under the provisions of our state constitution regarding removal of the Commission's orders to this Court, the power to change rates is not necessarily the same as the power to enforce a rate change. While Article XI, Section 7 grants the Commission the former power, the latter power is reserved for this Court when the company does not comply with the Commission's order and instead removes it. For these reasons, we agree with U S West that its filing of a removal action *54 suspends enforcement of the Commission's order while review of that order is pending in this Court.
{56} If the Court affirms the Commission's order, however, we do not believe that Article XI, Section 7 or the prohibition against retroactive ratemaking preclude us from enforcing the order as of the effective date stated therein. To apply such a prohibition in this context would provide an incentive for unreasonable delays by a party opposing the Commission's orders. Article XI, Section 7 requires this Court to "give precedence" to removal actions, and the powers and duties of this Court under that article "are in addition to the other powers vested in [it] by this constitution and the laws of the state." Thus, we do not read Article XI, Section 7 as prohibiting the Court from exercising its equitable powers under Article VI of our state constitution to enforce an order of the Commission as of the effective date stated in that order, provided that the Court's action does not infringe on the Commission's power to set rates or the rights of U S West and other parties to remove the Commission's orders to this Court.
{57} In its reply brief, U S West also contends that the Court cannot enforce the interim rate reduction as of the effective date stated in the Commission's order without violating the filed-rate doctrine because U S West has not filed new tariffs in response to that order. This contention lacks merit. The filed-rate doctrine provides that "`the rate of the carrier duly filed is the only lawful charge ... [and] the carrier must abide by it.'" American Tel. & Tel. Co. v. Central Office Tel., Inc., 524 U.S. 214, ___, 118 S.Ct. 1956, 1962, 141 L.Ed.2d 222 (1998) (quoting Louisville & Nashville R. Co. v. Maxwell, 237 U.S. 94, 97, 35 S.Ct. 494, 59 L.Ed. 853 (1915) and discussing the Interstate Commerce Act and the Federal Communications Act). However, the doctrine does not apply when, as here, the filed rate "`is found by the Commission to be unreasonable.'" Id. at ___, 118 S.Ct. at 1962 (quoting Maxwell, 237 U.S. at 97, 35 S.Ct. 494). Indeed, one purpose of the filed-rate doctrine is "to preserve the agency's primary jurisdiction to determine the reasonableness of rates." Tenore v. AT & T Wireless Servs., 136 Wash.2d 322, 962 P.2d 104, 108 (1998) (en banc), cert. denied, ___ U.S. ___, 119 S.Ct. 1096, 143 L.Ed.2d 95 (1999). Moreover, another purpose of the filed-rate doctrine is to further "the policy of nondiscriminatory rates [such that] similarly situated customers [do not] pay different rates for the same services." Id. at ___, 118 S.Ct. at 1963. The present case does not involve an issue of discriminatory ratepaying. For these reasons, the filed-rate doctrine does not apply here.

III. CONCLUSION
{58} In sum, we conclude that the Commission did not violate U S West's constitutional right to due process and we may enforce the Commission's order as of the effective date provided therein. Thus, we order U S West to file appropriate tariffs to implement the Commission's order within thirty days following the issuance of this Court's mandate. The implementation of the Commission's order shall include a refund or credit to ratepayers equal to the amount of overearnings the company has collected since July 13, 1998, plus accrued interest at the statutory rate. To ensure that U S West's right to seek modification or further review of the Commission's order is not compromised by its removal of that order to this Court, we also order that the deadline for the filing of a general rate case under the terms of the Commission's order shall not expire until sixty days after the issuance of the mandate from this Court. If the interim rate reduction is later determined to be unjustified as a result of a general rate case filed before this deadline, U S West may be entitled to a surcharge as provided in the Commission's order. Finally, the interim rate reduction ordered by the Commission is not to become permanent unless no general rate case is filed by the end of the sixty-day period following the issuance of this Court's mandate.
{59} IT IS SO ORDERED.
BACA, FRANCHINI and SERNA, JJ., concur.
NOTES
[1] Article XI, Sections 1 through 12 and 15 through 17 of the New Mexico Constitution were repealed effective January 1, 1999. We do not consider the effect, if any, of these changes in the law because this removal action commenced prior to the repeal of these sections of our state constitution.
[2] By "general rate case," we mean a proceeding that covers all aspects of a utility's revenue requirements and rate design and is based on the use of a historical "test year." See generally Charles F. Phillips, The Regulation of Public Utilities: Theory and Practice 168-72, 187-89 (2d ed.1988).
[3] The premise that ratemaking is entirely legislative in nature may be questioned in light of the fact that commissions with ratemaking powers commonly employ a mix of both legislative and adjudicative procedures. See Krieger, supra, at 1036-37. Indeed, if the Commission's ratemaking process in this case was entirely legislative in nature, some of the requirements of due process that we addressed earlier in this opinion arguably would not apply. See generally II Kenneth Culp Davis & Richard J. Pierce, Jr., Administrative Law Treatise § 9.2 (3d ed.1994). Regardless of whether the Commission's ratemaking function is characterized as legislative, executive, or quasi-judicial, however, the fact remains that it is separate from the functions of this Court under our state constitution. Cf. N.M. Const. art. III, § I (requiring that no person or collection of persons charged with exercising the powers of one department shall exercise any powers properly belonging to either of the others).